[Crim. No. 4783.   Second Dist., Div. One.   June 17, 1952.]

THE PEOPLE, Respondent, v. FRANK WALTER KRISTY, Appellant.

Robert B. Heggen for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an indictment returned by the grand jury of Los Angeles County and an amendment thereto, defendant was accused of the crime of murder. It was also alleged that he suffered a prior conviction of the crime of forgery, a felony, for which he served a term in the state prison. To the charge contained in the indictment as amended, defendant entered pleas of not guilty and not guilty by reason of insanity. He denied the prior conviction.

Trial was had before a jury which. returned a verdict finding defendant guilty of murder of the first degree and

recommending that he be punished by imprisonment in the state prison for the term of his natural life. The jury also found that the allegation of a prior conviction was true. The plea of not guilty by reason of insanity was withdrawn by defendant. A motion for a new trial was denied and sentence of imprisonment in the state prison for life was pronounced against defendant.

From the judgment of conviction and the order denying his motion for a new trial, defendant prosecutes this appeal.

Before epitomizing the factual background which gave rise to this prosecution, we pause to note appellant's claim that where there is a conflict in the evidence the testimony given "on both sides" should be narrated. However, the rule is that on appeal in a criminal case following a conviction, the evidence must be considered in the light most favorable to the prosecution. This, for the reason that an appellate tribunal is not authorized to retry the cause. It is the function of the jury in the first instance, and of the trial court after verdict to determine what facts are established by the evidence. It is only when it is made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the trial court, that the verdict returned by the jury and approved by the trial judge on motion for a new trial, may be set aside upon the ground of insufficiency of the evidence. As was said in *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778], "We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then determine whether such facts are sufficient to support the verdict."

With the foregoing rules in mind and after reading the voluminous record herein, covering more than 1,000 pages, we regard the following as a fair résumé of the evidence as reflected by the record herein, and sufficient for an understanding of the points presented for our consideration.

The record reveals that in 1937 defendant and Margaret Frances Thomas commenced living together as man and wife, and in December, 1937, a daughter, Helen, was born to them. However, defendant denied the truth of this testimony given by Helen's mother. After the birth of Helen the defendant and the mother of the former were known as Mr. and Mrs. Kristy, although the defendant's name was Krystopik.

In 1940 or 1941 Mrs. Kristy's two children, who were not the children of defendant, named Betty and Raymond, came

to live with them. In this regard defendant's testimony was that the two children just mentioned had lived with foster parents for several years, were grossly neglected, and that he was reponsible for and insisted upon bringing the children into his home. All of them continued to live together until April, 1950, when Mrs. Kristy left their home in Downey, California, at the request of defendant. She left the three children with defendant when she moved away, but Helen went to live with her in June of 1950. During the year following her departure from the home, Mrs. Kristy did not see her children Betty or Raymond, although she talked to Betty on the telephone.

In June, 1951, defendant and Betty asked Mrs. Kristy to return to the family home, which she did on June 15, 1951. It appears from the record that about a week before Mrs. Kristy returned Betty had told her that the defendant had "had things to do" with her. Betty was then 20 years old.

On June 20, 1951, a few days following her return, Mrs. Kristy received her paycheck. When she arrived home defendant, who was there, commenced a discussion with her as to what bills she should pay and their conversation led into an argument during which defendant told Mrs. Kristy about "having things to do with Betty." Testimony reveals that defendant said, "Well, . . . I'll tell you now, . . . I have screwed her, . . . I intend to screw her as long as she is in this house." This conversation is denied by defendant. There is in the record evidence that Mrs. Kristy then said, "Oh, no, you won't," and that defendant said, "Well, pack your damned clothes and get out of here then." Mrs. Kristy told defendant that she would. Later, when Betty came home from work Mrs. Kristy talked to her about what the defendant had stated, saying to Betty, "He said, Betty, that he had screwed you and he was going to keep on screwing you as long as you was in this house." That Betty, according to the witness, "turned at him (defendant) and her blue eyes turned black" and that she said, "You won't, Daddy, . . . you are not touching me another time." That defendant then said, "You all can pack your clothes and move." According to the testimony of Mrs. Kristy she said that they would do so but that when defendant discovered that all of the children were going to go with their mother, he asked her not to leave, with which request she complied.

On June 20, 1951, after Mrs. Kristy had agreed to remain, she and defendant had a talk. He said, "If Betty leaves

this house I'll kill her." Mrs. Kristy testified that she told him he wouldn't "get by" with it and he said that he knew that, but that he would kill her and that if Mrs. Kristy interfered he would kill her also. On June 22, 1951, defendant was drinking, and he kept repeating that he was going to kill Mrs. Kristy and Betty.

On June 23, 1951, Mrs. Kristy and the children were going to a square dance and she asked defendant to go. He stated that he had a telephone call to make and whether or not he went would depend on the outcome of the telephone call. However, he refused to telephone unless the others went out to the automobile. Mrs. Kristy, listening from the outside, heard defendant say over the telephone, "Well, my son likes to shoot too." Mrs. Kristy had seen defendant tear out an advertisement from a newspaper that afternoon and the next day after hearing the foregoing telephone conversation she obtained an unmutilated copy of the paper and compared it with the one from which the advertisement had been torn. She thereby discovered that the advertisement which had been torn out was one which offered guns for sale. On June 23d, someone who gave his name as "Frank Kristy" called a telephone number listed in an advertisement in the paper and asked to buy a small gun. During the week following June 24, 1951, defendant threatened Mrs. Kristy and Betty practically every other night and upon one such occasion told Betty that she did not have long to live.

On July 3, 1951, defendant said that he was going to make it a "real Fourth of July"; that it was not going to be "with just firecrackers." When Mrs. Kristy asked defendant what he meant, the latter replied that he was going to kill Betty on the Fourth of July, and when Betty came in that night defendant told her she did not have very much longer to live. After the girls had retired for the night defendant remained seated on the side of the bed occupied by Mrs. Kristy and himself. He kept repeating that he was going to kill Betty. Helen got up and went out to the kitchen. Upon her return defendant asked her three times what she had and she finally said, "Well, Daddy, . . . I have got a butcher knife. If you dare lay your hands on Betty, . . . I'll cut your throat from ear to ear." Defendant then accused Mrs. Kristy of influencing the children against him and when she said for that he was himself responsible, he stated, "Well, I guess I'll just have to do away with the whole family." It is in evidence that defendant, during that evening, was drinking.

On the morning of July 4th, Mrs. Kristy discovered both telephone wires in the house had been cut. Defendant taped them together, saying, "Well, I must have done it."

On July 5, 1951, Mrs. Kristy, Betty and Helen were planning to swim at Long Beach. After dinner they went to Bellflower to purchase a suit for Helen. Upon their return Mrs. Kristy sat in the dining room altering the buttons on the suit when the girls started to take care of the dishes in the kitchen. Mrs. Kristy mentioned that she was going to take the girls swimming. Defendant was sitting in the living room and without saying anything he went to the bedroom or back porch and returned to the kitchen. Thereupon, he pulled a gun out of his shirt and said, "You didn't think I had a gun, did you?" Mrs. Kristy jumped between defendant and Betty, whereupon the former told her to get out of the way. He kept the gun pointed at the three of them. The testimony was that it was a small gun and that defendant's hand covered most of it. Mrs. Kristy said, "Frank, . . . for God's sake. Don't do anything drastic." Whereupon defendant said, "Well, that son-of-a-bitch there should be pleading for her life, not you." Helen stepped toward him and defendant told her to get back, that he would just as soon kill her as anybody else. He went to the service porch and motioned with the gun for the women to come out there. They went out and while he kept the gun pointed at them defendant reached into his bedroom and got Betty's purse which he handed to her together with her keys. He then told them to go out through the front of the house. He declared that if Betty did not go with him, three dead bodies would be found there. The women complied, with defendant walking behind them armed with the gun. When they reached the living room defendant pushed Betty on ahead of him through the front door. As he went out the front door defendant put the gun back in his shirt, saying that if Mrs. Kristy called the "cops", and if a "cop" drove up behind or beside him he would shoot Betty right on the spot.

According to her testimony, Mrs. Kristy was begging defendant not to take Betty but he said, "I'm going to make her drive me out here ten miles . . . I will kill myself so she can see it . . . then I will let her come back." With defendant following her, Betty walked through the front gate. Mrs. Kristy went to the gate but defendant turned around and said, "If you come through that gate . . . I'll shoot you right here." Mrs. Kristy asked if defendant would let

her kiss Betty goodbye, but he told her not to go through the gate. Turning to Betty he directed her to get into her automobile. She got in on the driver's side. The vehicle was a light green Ford with license number 9Y7578. Defendant got in on the other side of the car. Betty started the motor and they drove away.

Betty did not take any clothes with her. While defendant was pointing the gun at her she said nothing. He and Betty drove away about five minutes before 7 o'clock and Mrs. Kristy notified the police about two and a half hours later. She never again talked with or saw Betty alive.

On July 9, 1951, in response to a telephone call, Lloyd Bell, Deputy Sheriff of Clark County, Nevada, went to McCarran Field, which is located on the road from Los Angeles to Las Vegas, Nevada. There he found the green Ford automobile and license number belonging to Betty. The automobile was impounded and on July 14th, Mr. Bell searched it. He found an expended cartridge on the ledge between the back seat and the back window. He put the cartridge in an envelope and subsequently delivered it to Deputy Sheriff Lacey.

About 7 o'clock on the night of July 13, 1951, Richard Hill, his wife and three children, were driving north on Highway 6 in the direction of Palmdale and Mojave, the latter of which is located in Kern County. They parked beside the road to permit the children to drink some chocolate milk. After running up and down the hill for some little time, one of the girls ran to her father and said there was a "dead man in the gully." The father thought the child was mistaken until the other girl and the boy came to him with the same information. Mr. Hill left his automobile, walked to the top of the gully and looked down. He observed a body. Placing the children back in the automobile he drove away to find a telephone or highway patrol car. About a mile down the road he saw Officer Nelson, a highway patrolman, stop beside the road in his car, and Mr. Hill reported the matter to the officer. Both Mr. Hill and the officer drove back to the place where the former had first stopped and he showed the body to the officer. The body was located in the ravine about 15 feet from the top thereof. The head was lying northwest, and the right hand and right arm were draped over a barrel.

Going down into the gully about 4 feet, Officer Nelson there found a silver cigarette lighter and silver cigarette case which belonged to the defendant and which he had with him when he left his home on the night of July 5, 1951. The

initials "F.W.K." were on the lighter. There was a pair of women's shoes lying near a bush 1 or 2 feet from the top of the gully, 5 feet to the east of the lighter and case, and 8 to 10 feet from the body. The shoes were the ones Betty had worn the night of July 5th when she drove away with defendant. Officer Nelson notified the sheriff's office in response to which some deputy sheriffs arrived. One of them, Officer Manley, went down into the gully to determine if there was anything which would indicate a homicide. On his way down he found the beads which Betty had on when she left home on July 5th, lying just above the body. He saw no gun. The body was in a state of decomposition and there were indications that it had been there for several days. One of the officers picked up the shoes and noticed there was dried mud on them, more noticeable on the left than the right one. A ring and wrist watch were taken from Betty's body.

On July 14, 1951, an autopsy on the body of Betty revealed that the immediate cause of her death was a gunshot wound of the head. From the right posterior portion of the brain the autopsy surgeon took a deformed copper-jacketed bullet of small calibre which was turned over to the sheriff's crime laboratory along with the hands from the body. Deputy Sheriff Thomas of the sheriff's crime laboratory made a fingerprint impression of the right thumb of the hand which was delivered to him. This print was compared with that on the driver's license bearing the name of Betty Jean Hansen and the conclusion was reached that they were the prints of the same person.

W. W. Thomas, who qualified as a ballistics expert, examined the bullet and formed the opinion that it was a .25 calibre bullet, manufactured by Western Arms Company, Western Cartridge Company, or Winchester Repeating Arms Company, and that it showed an ejector mark of the type made by an automatic pistol.

On July 17, 1951, George W. Lacey, a Los Angeles County Deputy Sheriff, went to Las Vegas, Nevada. He examined the aforesaid light green Ford. It had the appearance of having been recently washed. On the right-hand door near the center, 4 or 5 inches from the bottom, he found a reddish-brown stain. He removed the stain and saved it for examination. There were five reddish-brown spots in the middle section of the back seatcover near the front edge thereof. He removed the seatcover for examination. On the inside of the right-hand door there was a reddish-brown spot which appeared

"to have dripped with a very small spatter." This he also removed for examination. There were several spots on the front floormat, which spots appeared to have been caused by the dripping of a liquid. Mr. Lacey took the floormat with him. The latter also received an envelope which contained an exploded shell which he later gave to Mr. Thomas of the Los Angeles Sheriff's Crime Laboratory.

After preliminary check of the spots on the car by Mr. Lacey while he was in Las Vegas, Nevada, and which showed that each of the spots could be blood, he returned to Los Angeles with the spots from the door, the seatcover, and the floormat. He subjected them to further examinations and formed the opinion that each had been caused by human blood; that the blood on the front floormat appeared to have been diluted. He could not state definitely how long the blood had been there, but in his opinion it could have been there for a week or a little longer, but not over 10 days or two weeks at the most.

On August 3, 1951, Los Angeles County Deputy Sheriff Jolivette was in Denver, Colorado, for the purpose of returning defendant to California after the latter's arrest. On that date he took some statements from defendant. These statements, it was testified, were free and voluntary and no force or violence was used on defendant's person, and there was no promise of immunity or hope of reward extended to him for his statements.

Deputy Sheriff Jolivette asked defendant if he had made a statement in Sterling, Colorado, to Chief of Police Walker; defendant replied that he had. Deputy Sheriff Jolivette had in his possession at that time a document which had been given to him in Los Angeles by Captain Burns, his superior officer, who told Deputy Sheriff Jolivette that Chief of Police Walker had read the statement to him over the telephone, that a stenographer had listened in on the reading, had made a transcription of the statement, and that the document in Deputy Sheriff Jolivette's possession contained the transcription of such statement. Deputy Sheriff Jolivette showed the transcription to the defendant. The latter did not have his glasses so the deputy sheriff read the statement to defendant and asked the latter if it was a true copy of the statement that he had made to Chief Walker. Defendant said, "Well, that's isn't the way it happened." The deputy sheriff said, "Well, all I want to know is if this is a true copy of the statement that you gave to the chief." Defendant then stated

that it was a true copy of what he gave to the chief, but that it was not true as to the facts. Defendant, however, signed the document in the deputy sheriff's presence as being a true transcription of what he had told Chief Walker. This document will be later referred to and discussed.

During the ensuing days, Deputy Sheriff Jolivette had other conversations with defendant, during which no force or violence was used and no promise of immunity or hope of reward extended. During these conversations, defendant denied that he had made love to Betty on July 5th; denied that he had her on the back seat of the automobile that day, and denied that they were in the vehicle when the gun was discharged. He stated that he had left the trousers he was wearing on July 5th in the bleachers in Las Vegas and had purchased another pair. He stated that he threw away in Las Vegas the shirt he had on July 5th; that he had also thrown away his wallet and I. D. card. He stated that the lighter and cigarette case which had been found beside Betty's body were his and that he did not know he had lost them. He denied he had been looking for a gun when he got the gun he possessed, saying that he just happened to meet a man who wanted to sell a gun and purchased it.

On August 15, 1951, Deputy Sheriff Jolivette and other law enforcement officers took defendant in a car to the place where the body had been found. After they stopped at the place where the body was found they attempted to take defendant to the lip of the gully, but he refused to go. He told the officers that after Betty fell into the canyon he stood there about three minutes listening, then got into the automobile and drove away. At 8:20 p. m. defendant stated that it was about the same time of night as when he was at that scene with Betty. According to the testimony, it was then just getting dark.

Appearing as a witness in his own behalf, defendant testified that he was 43 years old, that he started to live with Margaret Frances Kristy in 1937; that at the time they commenced living together she was pregnant and that he did not know that she had other children. That Betty was born in December, 1937. He further testified that in 1939 Mrs. Kristy told him that her two children were being mistreated by the people with whom they were living and that in 1942 defendant and Mrs. Kristy took the children home with them, when they resumed their own names of Betty Jean Hansen and

Raymond Earl Thomas. That during the succeeding few years they all lived together in various places in California, New Jersey and Kansas, and that they returned to Los Angeles in 1945 and that in 1948 he and Mrs. Kristy purchased a home in Downey, California. That about May of 1950, while he was lying in bed with Betty and Helen, Mrs. Kristy entered the room and accused him of having intercourse with Betty. He testified this accusation was untrue; that Mrs. Kristy constantly accused him of having intercourse with Betty and that the latter resented the accusation. That arguments and accusations continued for several days when Mrs. Kristy moved away. That he next saw her in July of 1950 when Mrs. Kristy and Helen returned to live with him. That after Mrs. Kristy left the house defendant and Betty commenced having sexual intercourse. That about June 20, 1951, when Mrs. Kristy returned, she and defendant engaged in an argument concerning Betty, Mrs. Kristy admonished defendant "not to mess around with Betty," but that he did not know what she meant by that and told her he "wasn't messing with Betty and didn't intend to." He however, testified that he had sexual intercourse with Betty about seven times prior to the last named conversation. That on every occasion when he had intercourse with her Betty had agreed to it. That arguments between Mrs. Kristy and the defendant continued. That on the night of July 3d he did not make any threats against or statements about Betty. That he did not say he had been having intercourse with Betty and that he would continue so to do as long as she remained in his house. That Betty did not say, "No you won't, Daddy." That on July 5th defendant sold his automobile, and that on that evening during dinner there was an argument whether Betty should go out with a man on that evening. That defendant objected to it while Mrs. Kristy approved it. That on this evening Mrs. Kristy and the girls went to Bellflower to procure a bathing suit for Helen and that defendant remained at home watching television. That he had several drinks of liquor in addition to those he had consumed before dinner and was getting "pretty drunk." That upon their return the two girls started to wash dishes and that Mrs. Kristy was in the living room sewing buttons on the bathing suit. That Mrs. Kristy informed defendant that she, Helen and Betty were going swimming and invited him to go along. That he declined the invitation and advised them that Betty had made different arrangements. That Mrs. Kristy told him

that Betty was not going with him. That thereupon, he got up and went into the bedroom where he got a bottle of whiskey and some money which he had behind some books. That as he was getting the money he noticed his gun which he had put there over a month before following his purchase of it from a man in a saloon. He testified that he had purchased the gun so that Raymond would have it and be able to "protect" the girls when defendant was gone from the house. That he had inspected the gun within a few days after he purchased it and discovered that there were no bullets in it and that the trigger would not move. Defendant further testified that his telephone call with reference to the weapon was in connection with his effort to find a gunsmith who would repair the gun. That the person who answered the telephone call was desirous of selling guns but that defendant advised her he was not interested in "big guns"; that he wanted a small gun for his boy to use. That he was trying to have the gun repaired and was not desirous of purchasing one. Defendant testified that he picked up the gun and went back into the kitchen, keeping it in the palm of his hand. That he stopped by the door between the kitchen and the living room, showing his gun to Mrs. Kristy, and, said, "I suppose you thought I didn't have a gun, but I fooled you. I have got a gun." That Mrs. Kristy jumped up and stood by the girls while defendant said, "Betty is not going swimming, she is going with me." That Mrs. Kristy requested him not to take Betty with him and that he told them all to go out onto the back porch. That after they did so, he told Betty to get her purse and that she did so. That she walked in front of him, or alongside of him into the kitchen. That Helen and Mrs. Kristy were still on the back porch watching Betty. That Mrs. Kristy again requested him not to take Betty with him. Defendant testified he did not make any threats to kill anybody or use force or violence on any of those present. That Betty went through the kitchen followed by Helen, Mrs. Kristy and defendant. That they all walked out through the front door except Helen who stayed inside. That as Betty was going from the gate to the automobile, defendant stopped at the gate when Mrs. Kristy asked Betty to come back and kiss her, but that Betty did not do so. Defendant testified that he did not order Betty to get into the automobile and that he did not admonish Mrs. Kristy not to call the police or say that he would shoot Betty if he discovered that the police were following them. That he did not call Betty a son-of-a-bitch, nor say

that she should be pleading for her life instead of Mrs. Kristy. Defendant denied that he stated he was going to have Betty drive him out some 10 miles and that he would then shoot himself and let Betty return.

Defendant testified that after they got into the automobile and started to drive away the only conversation between him and Betty was that the latter asked defendant which would be the best way to go. That they drove through various streets and at one place stopped where defendant went into a store and bought a bottle of whiskey, and, at Betty's request, attempted to telephone to advise her mother that everything was "alright." That he was unable to complete the telephone call and that they then drove on and did not stop until they got to the top of a hill on Highway 6. That when they stopped, they sat in the car and that the reason for their stopping was that Betty said she wanted to rest. That it was getting dark. That after awhile they got out of the automobile and walked around to the edge of the gully to see what the noise was that they had heard. That they were walking slowly and talking about what they were going to do when they arrived at Reno, Nevada. That Betty suggested she had no clothes and that defendant advised her he would buy clothes for her. That it was getting darker and that he was attempting to convince her that he would purchase all the clothes she would need but that she was insisting upon returning home to obtain her clothes. That she was holding him and he was holding her. That as they were standing there with her "pushing toward the car" and him "trying to hold her back," the gun dropped from his shirt to the ground. That he released his hold on her and stooped over to pick up the gun. That as he was thus engaged she "grabbed his hand" and as he raised it up he pulled away from her and the gun "went off." That she "let go" and rolled sideways down the hill. That he stood there for about three minutes and then got on his hands and knees and looked down the hill. That it was dark and that at the time he kneeled down and looked he had a cigarette lighter and cigarette case in his shirt pocket. That he did not hear anything. That he called Betty's name several times but received no answer. That when Betty did not answer he "got scared," entered the automobile, and drove away. That he had the gun in his hand until he got into the vehicle when he put it on the seat. That as he drove along he stopped at a few places for something to eat and drink. That somewhere along the way he threw the gun out

of the window of the automobile. That he drove until he came to Las Vegas, Nevada, where he parked the car in an open field and abandoned it.

As a first ground for reversal appellant urges that the trial court erred in refusing to strike out testimony concerning blood spots and a cartridge case found in the deceased's automobile when it was discovered in Las Vegas, Nevada. It is appellant's contention that these items of evidence were neither relevant nor material and that they did not tend to prove any involved issue.

It is not necessary to here repeat the evidence given at the trial concerning the blood spots and cartridge case because such evidence is fully set forth in the factual narrative heretofore given.

The admission of this testimony was not error. It was necessary for the prosecution to show as accurately as circumstances would permit, the means by which and the manner in which Betty Jean Hansen had come to her death.

As was said in *People* v. *Billings*, 34 Cal.App. 549, 552, 553 [168 P. 396], ''. . . The relevancy of proffered proof in a criminal case depends upon whether or not it tends to sustain a legitimate hypothesis of the guilt of the defendant, and, generally speaking, an incidental fact is relative to the main fact in issue when in accord with the ordinary course of events and common experience the existence of the incidental fact, standing alone or when considered in connection with other established facts, tends in some degree to make the main fact in issue certain. It is not necessary that such incidental fact should bear directly upon the main fact in issue, for it will suffice as a pertinent piece of proof if it can be said to constitute a link, however small, in the chain of evidence and tends thereby to establish the existence of the main fact in issue. (Citing authority.) Hence any fact is relevant evidence which naturally tends to show the means and method employed in the commission of a crime, and therefore it was proper in the present case to admit evidence of the identification of the cartridges picked up near the scene of, and shortly after, the explosion, and, having been so identified, they were rightfully admitted in evidence.''

It was established that Betty was last seen in her automobile with appellant; that he had a small gun; that she met her death from a .25 calibre bullet, and that subsequently, an expended .25 calibre cartridge case and blood spots were found in the vehicle. From all of these proven facts the jury might well

have drawn the inference that she was killed in her automobile by the small weapon which appellant had been seen with in the vehicle, thus tending in some degree to connect appellant with the homicide and establish him as the perpetrator thereof (*People* v. *Sambrano*, 33 Cal.App.2d 200, 211, 212 [91 P.2d 221]; Code Civ. Proc., §§ 1958, 1960, 1870). Furthermore, whatever inferences could be drawn from the foregoing evidence that the victim was killed in her automobile would also serve to contradict the statements of appellant that she had fallen into the gully where her dead body was subsequently discovered after, according to appellant, his weapon had inexplicably discharged while he and Betty were standing in the road at the edge of the gully. It was also admissible as tending to refute the verity of such statements. ■ Deception, falsehood and fabrication as to the facts of a case are treated as tending to show consciousness of guilt, and are admissible on the same theory as flight and concealment of the person when charged with crime (*People* v. *Arnold*, 43 Mich. 303 [5 N.W. 385, 38 Am.Rep. 182]).

■ Objections to the evidence concerning the cartridge case and blood stains to the effect that the time of the discovery was too remote from the date of the crime, or that appellant was not in actual control of the automobile at the time of discovery, and that there existed a possibility that unknown persons may have occupied the vehicle in the intervening time, all go to the probative force or weight of the evidence, but do not militate against its admissibility (*People* v. *Peete,* 54 Cal. App. 333, 351 [202 P. 51]).

It is next contended that the district attorney was guilty of prejudicial misconduct. In support of this claim appellant directs attention to that portion of the record wherein appears the following, all of which occurred during his cross-examination.

As to the first occasion about which complaint is made, the following occurred:

"Q. (By Mr. Powers, Deputy District Attorney.) I will ask you if you were convicted in New Jersey of the crime of forgery, a high misdemeanor? A. But it is not a felony.

"Mr. Heggen: If the Court please, I will object to that as being improper cross-examination, improper impeachment. The answer was it was a misdemeanor and counsel has no evidence adduced that it is a felony.

"The Court: Objection sustained, the answer is stricken.

"Mr. Heggen: And the jury should be, I think, requested,

your Honor, to disregard the question and answer if there was any answer.

"THE COURT: I think the jury has learned by this time that any matters which are stricken out are to be disregarded by them.

"Q. By MR. POWERS: You say the matter in New Jersey was handled as a misdemeanor? A. Yes, sir.

"MR. HEGGEN: If the Court please, I will object to that as having absolutely no materiality in this case, and designed to prejudice the defendant in the eyes of the jury and the Court.

"THE COURT: Objection sustained. It is material, but ——

"MR. POWERS: I am sure the Court appreciates that I have some knowledge of the New Jersey law under which my question is asked, and that there are in New Jersey offenses that are denoted high and low misdemeanors.

"THE COURT: Mr. Powers, the witness has denied he has been convicted of any other felony other than the one in California.

"MR. HEGGEN: If you have any other evidence to produce to rebut that you can go ahead, but I won't go along with your knowledge of New Jersey law.

"THE COURT: Proceed."

While this line of cross-examination was highly improper and the court promptly and correctly sustained objections interposed thereto, we are not prepared to say that the substantial rights of appellant were prejudicially affected thereby. An examination of the record reveals that during the direct examination of Deputy Sheriff Jolivette, the latter testified to a conversation had with appellant after the latter's arrest. Without objection, this witness testified that he inquired of appellant whether he "had any record?" to which the latter replied that "he did 15 or 18 months in a workhouse in Trenton, New Jersey, for forgery . . ., that he had served 20 months in San Quentin before going to Trenton." Furthermore, in closing his direct examination of appellant, the latter's counsel interrogated him as follows:

"Q. And there was some reference made to some difficulty in New Jersey. Is that a felony or was that a misdemeanor? A. That is a misdemeanor.

"Q. That was over 20 years ago, too, wasn't it, sir? A. Yes, sir."

The cross-examination was then commenced and after he had been asked a few questions concerning his conviction in

California, appellant was asked the questions of which he now complains.

We are persuaded that the error on the part of the district attorney could not have prejudicially injured appellant's substantial rights for the reason that testimony to the same effect as that sought to be elicited by the district attorney had crept into the record as above outlined, prior to the time when the questions now complained of were asked (*People* v. *Mancuso*, 23 Cal.App. 146, 147 [137 P. 278]).

The next occasion about which complaint is made that the deputy district attorney resorted to prejudicial misconduct occurred after appellant had testified, *without objection*, that he had been having sexual intercourse with the victim during the past year, in his home in Downey, and that Raymond, the 16-year-old son of Mrs. Kristy, had been present in the house when such actions had taken place.

Thereafter, the following occurred:

"Q. You didn't consider having relations with your daughter Betty in the presence of a 16 year old boy ——

"MR. HEGGEN: Just a moment. Just a moment.

"Q. By MR. POWERS: —— as contributing to his delinquency?

"MR. HEGGEN: I will object to that as being immaterial and an attempt to prejudice the defendant before the jury.

"THE COURT: Objection sustained.

"Q. By MR. POWERS: Was your son Raymond home on every evening when you had sexual relations with your daughter Betty? A. No, sir.

"MR. HEGGEN: I object to that as being immaterial.

"THE COURT: Sustained. The answer is stricken."

In view of the fact that appellant had theretofore testified without objection that he had been having sexual intercourse with Betty and that Mrs. Kristy's 16-year-old boy had been present in the house at the time such acts took place, coupled with the fact that the court promptly and decisively sustained an objection to the question, ordered the answer stricken, and that appellant did not request the court to instruct the jury to disregard the answer, and while we do not commend or even condone such conduct on the part of the prosecutor, nevertheless, under the circumstances of this case, we are satisfied that neither prejudicial error nor reversible error was committed. In the light of the circumstances under which the challenged misconduct of the district attorney occurred, we cannot say that the effect of such misconduct

could not be overcome or removed by appropriate instructions to the jury. The authorities are uniform that under such circumstances, in the absence of proper request for the court to instruct the jury to disregard such misconduct, it may not be reviewed on appeal (*People* v. *Nakis,* 184 Cal. 105, 116 [193 P. 92]; *People* v. *Mancuso,* 23 Cal.App. 146, 148 [137 P. 278]; *People* v. *Ward,* 40 Cal.App.2d 143, 150 [104 P.2d 537]).

Finally, during the cross-examination of appellant the following transpired:

''Q. Did you know, sir, that as an ex-convict it was a felony for you to have a gun?

''Mr. HEGGEN: If the Court please, I will object to that as immaterial. He is still trying to prejudice the defendant in the eyes of the Court and the jury. I wish he would stick to the facts in this case instead of trying to besmirch the defendant.

''Mr. POWERS: I am not trying to besmirch the defendant. This goes to motive. He said he bought it for a particular motive. I am endeavoring to show it is a felony for an ex-convict to have a gun and there might be other motives ——

''Mr. HEGGEN: I fail to see any motive in this. And I know it is calculated to prejudice the defendant, to try to accuse him of some other crime which he never committed. I suggest you stick on the issues of this case.

''THE COURT: The objection to the question is sustained.''

Again the court promptly sustained an objection to the questions and again appellant refrained from requesting that the jury be instructed to disregard the questions and comments. ▊ In view of the failure of appellant to ask the court to admonish the jury to disregard the questions and when such an admonition would, doubtless have been sufficient to cure any effect the questions might have produced, the claimed misconduct cannot be considered on appeal.

Furthermore, when, upon the first occasion herein narrated, wherein objection was made to questions concerning appellant's prior conviction of a felony and such objection was sustained, the court upon request of appellant's counsel stated, ''I think the jury has learned by this time that any matters which are stricken out are to be disregarded by them.'' While the ruling was possibly not as emphatic as might be desired under the circumstances, nevertheless, since it was given immediately following the sustaining of an objection to the first challenged question involving a charge of misconduct by the district attorney, it cannot be said that it was

not sufficiently definite for the purpose of advising the jury that the question that had just been asked as well as the subsequent interrogatories were to be disregarded by them. We are impressed that in view of the overwhelming evidence of appellant's guilt, the jury's verdict would not have been different had the questions not been asked (Const. Cal., art. VI, § 4½).

While even convincing proof of the guilt of the accused does not necessarily mean, under all circumstances, that there has been no miscarriage of justice, we regard the evidence in the instant case as sufficient, under the circumstances here present, insofar as the claimed misconduct of the district attorney is concerned, to put into operation the provisions of the Constitution just cited. We are satisfied that the acts of the district attorney, although misconduct, did not prevent appellant from having a fair trial or result in a miscarriage of justice. In view of the court's prompt rulings and instructions to disregard the questions when requested by appellant, which it will be presumed were heeded by the jury, it cannot be said under the facts of the instant case, that the cause of the accused suffered by reason of anything contained in the challenged questions however improper they may have been (*People* v. *Cook*, 93 Cal.App. 174, 176 [269 P. 176] ; *People* v. *Scott*, 24 Cal.App. 440, 447 [141 P. 945] ; *People* v. *Duncan*, 31 Cal.App. 772, 773 [161 P. 763] ; *People* v. *Sprado*, 72 Cal. App. 582, 597 [237 P. 1087] ).

Another ground relied upon for reversal is that the trial court erred in admitting what appellant characterizes as a "written confession made by the defendant to one Captain Walker, Chief of Police of Sterling, Colorado."

In this regard the record reflects that Deputy Sheriff Jolivette of Los Angeles County first saw appellant in Denver, Colorado, on August 3, 1951. The deputy had in his possession a document which had been given to him by Captain Burns in Los Angeles with the explanation that it was a transcription of a statement which had been read to the latter over the telephone by Chief Walker of Sterling, Colorado, and which statement the latter said appellant had made to him. Appellant concedes that no force nor violence was used on him, no promise of immunity nor hope of reward were extended to him for any statement and that his statements to Deputy Sheriff Jolivette were free and voluntary. The latter asked appellant if he had made a statement in Sterling, Colorado, to Chief of Police Walker. Appellant stated that he had.

Deputy Sheriff Jolivette showed appellant the document which had been given him by Captain Burns in Los Angeles. At that time appellant did not have his glasses, so Deputy Sheriff Jolivette read the document to him and asked him if it was a true copy of the statement he had made to Chief Walker. Appellant said that it was a true copy of what he said to the chief, but that it was not true as to the facts. Appellant thereupon signed the document in Deputy Sheriff Jolivette's presence, stating that it was a true copy of what he said to the police chief. We deem it unnecessary to here set forth the somewhat lengthy statement, because, except for those facts which appellant testified were untrue, the statement parallels the testimony given by him.

Although appellant makes no contention that the aforesaid statement was obtained by force or violence, threats, intimidation, or of immunity or hope of reward, the prosecution was not required to lay any foundation for a "confession" before offering appellant's statement in evidence. ▮ Manifestly, the statement was not a "confession," but an "admission," and as such receivable without any prior evidence of its voluntary character. In no part of appellant's recital of what he claimed to be his own conduct toward the victim did he state or admit that he had done any wrongful or unlawful act in connection with the murder for which he was indicted. None of the facts admitted by appellant imported guilt or involved a crime—at least not any such crime as murder. While the statement may be said to contain admissions which when taken in connection with other proved facts in the case, are circumstances of a highly incriminating nature, the statement by no means contains an admission of guilt. ▮ Before an admission or declaration may be characterized as a "confession" it must in some way be an acknowledgment of guilt and be so intended (*People* v. *Clifton,* 186 Cal. 143 [198 P. 1065] ; *People* v. *Fowler,* 178 Cal. 657 [174 P. 892] ; *People* v. *Sambrano,* 33 Cal.App.2d 200, 212 [91 P.2d 221]).

In the case at bar there was read to appellant what purported to be a statement which he had theretofore made to the Chief of Police of Sterling, Colorado. He admitted that he had freely and voluntarily made that statement to the police chief, although contending that some of the facts in the statement were untrue. ▮ Under the rule announced in *People* v. *Sberno,* 22 Cal.App.2d 392, 395 [71 P.2d 274], the written document purporting to be a transcript of appellant's statement to Chief Walker was properly admitted after

Deputy Sheriff Jolivette laid the foundation for such admission by testifying that appellant voluntarily admitted to the officer that he had made such statement.

Appellant's contention that because at the time he signed the statement for Deputy Sheriff Jolivette, he denied the truth of certain declarations therein contained, the signed document was inadmissible, is without merit. ■ Manifestly, the contention of an accused that prior statements made by him were in whole or in part false does not render the declarations inadmissible. ■ In fact the prosecution clearly has the right to show that one suspected of or charged with the commission of crime made false statements (*People* v. *Cole*, 141 Cal. 88, 90 [74 P. 547]). Satisfactory proof having been made that the original statement to Chief Walker was freely and voluntarily given, appellant cannot now be heard to complain of its inadmissibility upon the ground that certain of the declarations therein contained were false.

Finally, it is urged by appellant that the evidence is insufficient to support a verdict of murder of the first degree. ■ In a prosecution for murder, evidence showing that the killing was the result of a wilful, deliberate and premeditated intent to kill need not be shown by direct evidence, but may be inferred from the proof of such facts and circumstances as will furnish a reasonable foundation for such a conclusion. ■ And the triers of fact—jury or judge—are invested with the exclusive province of drawing such a conclusion. ■ An appellate tribunal is not authorized to determine conflicts in the evidence nor to choose between different inferences which reasonably may be drawn from the testimony. The sole question presented to us insofar as the admissible evidence is concerned, is as to its sufficiency to support the verdict. ■ If there is substantial evidence in the record to support the ultimate fact found in the trial court that appellant was guilty of murder of the first degree, that determination must be upheld.

■ Applying these rules to the evidence in this case which has heretofore been narrated, involving as it does, the conduct of appellant both prior to and immediately after the victim met her death, his neglect to aid her after he says she was accidentally shot, his subsequent flight from city to city, all tend to refute the story of appellant that the homicide occurred accidentally while he and Betty were standing near a gully. From all the evidence in this record we are persuaded that a deliberate intention to kill is fairly deducible.

717

The verdict was justified by the evidence and there is no prejudicial error appearing in the record.

The judgment and the order denying defendant's motion for a new trial are, and each is affirmed.

Doran, J., and Drapeau, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 17, 1952.