[Crim. No. 3847. Second Dist., Div. One. Feb. 28, 1945.]

THE PEOPLE, Respondent, v. VERA BASSETT (True Name Lucille McBride), Appellant.

Max M. Solomon and Ward Sullivan for Appellant.

Robert W. Kenny, Attorney General, and Carl S. Kegley, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the district attorney of Los Angeles County, defendant was accused of a violation of section 11160 of the Health and Safety Code, which, among other things, denounces as a felony the possession of narcotics, except as otherwise in said code provided. Upon her arraignment, defendant moved to set aside the information pursuant to section 995 of the Penal Code, which motion was denied. Following the entry of a not guilty plea and waiver of a jury, the cause proceeded to trial before the court, resulting in the conviction of defendant of the offense as charged in the information. Defendant's motion for a new trial was denied and judgment was pronounced. From such judgment and order defendant prosecutes this appeal.

As the sole ground urged by defendant for a reversal of the judgment is that the evidence is insufficient to support the same, it becomes necessary to epitomize the testimony introduced at the trial. In that regard, the record discloses that about four o'clock on the afternoon of April 29, 1944, two federal narcotics inspectors, accompanied by two detectives from the Narcotic Division of the Los Angeles Police Department, went to the apartment occupied by defendant in the city of Los Angeles. Federal Inspector Marsh knocked on the door and thereupon defendant looked through a small opening in the door. The federal agent then attempted to gain admission to the apartment by advising the defendant that his name was "Pat" and asking her if she "didn't remember him." Defendant advised him that she was unacquainted with him and closed the little opening in the door, through which she had been looking. Immediately thereafter Inspector Marsh knocked again upon the door and informed the defendant that he and his associates were officers, that they had a complaint that she was "hustling" and desired to make an examination of the premises. Defendant admitted them into the apartment where, in addition to herself, there was present a man and another woman.

The apartment occupied by the defendant consisted of a single bedroom with living room, bath, hallway, kitchen, and in the latter place was a dining space. While the other officers were examining and searching the premises, Inspector Marsh searched the hallway. Later he went into the bathroom and noticed that the window therein was standing open. He reached out of this window in the bathroom and placed his hand under the metal hood in the lightwell, where he felt a paper sack. He thereupon stepped through the window, took his flashlight, observed the paper sack under the metal hood, removed it and took the same and the contents thereof back into the apartment. At that time one of the police officers and the defendant were in the bedroom. Inspector Marsh testified that in order to touch the paper sack he had to reach out about two and a half feet, but that he still had his own feet on the bathroom floor. He estimated the distance from the floor of the lightwell to the lower level of the bathroom window as twenty inches. When Inspector Marsh showed the sack to the defendant "she wanted to know what it was." The inspector testified that the defendant said "What is it?" to which he replied "You know very well what it is," and defendant said "Let me see it." It might here be noted that the bathroom windows from both the apartment No. 101, occupied by the defendant, and the adjoining apartment No. 102, opened on the same lightwell where the aforesaid sack was found. The contents of the manila paper sack, which Inspector Marsh testified he found under the hood in the lightwell, were introduced into evidence and consisted of a black jar, three white jars, a bottle with a tube fastened with a rubber nipple over the top, a piece of newspaper, a piece of tissue paper, a piece of paper cut and folded in cone fashion and held by a needle, an English oval Philip Morris cigaret box. At the trial it was stipulated that, if an expert witness was called, he would testify that the contents of the jars aforesaid consisted of opium and would testify that the box contained yen shee.

A small metal lamp was discovered by one of the federal agents on a knickknack shelf in the kitchen under a red colored water tumbler. The inspector testified that he did not notice the lamp under the red glass until he lifted the latter. This witness further testified that he did not smell the odor of alcohol on the lamp, but what he smelled appeared to him

to be peanut oil. He testified that upon further examination he discovered that the wick in the lamp was oily.

After making the arrest the federal and city officers took the defendant and her two guests to the United States Narcotic Bureau in the Federal Building, where the defendant had a conversation with Inspector Marsh and Supervisor Manning of the Federal Narcotics Bureau. In this conversation, according to the officers, defendant stated that her guest Dorothy Martin did not know anything about the opium. According to the federal inspector, the defendant, when asked by Supervisor Manning if she would say that the opium belonged to her, replied, ''Well, what else can I say? You found it right in my apartment, didn't you?'' When asked if she was trying to protect the person from whom she received the opium, defendant replied ''No, I would just rather not say any more about it.'' It was also testified that in the foregoing conversation the defendant stated she had smoked opium for some twelve or fifteen years ''off and on.'' Inspector Marsh further testified that the defendant stated to him that apartment 101 was hers; that no one else shared it with her, but that she permitted Dorothy Martin to come there occasionally. It might here be noted that the aforesaid manila paper bag containing the opium and yen shee was found about five feet from the sill of the window to apartment 102 and approximately three feet from the sill of the window to apartment 101 occupied by the defendant. It was further testified that an examination of the contents of the paper sack was made to determine the existence thereon of any fingerprints. When the defendant attempted to ascertain whether or not any fingerprints were found, an objection to such question was sustained by the court with the statement ''If they were found, we will hear about it, and if they weren't we will presume—if we don't hear about it, we will presume there were none found.'' No evidence was introduced at the trial to show that the defendant's fingerprints were found upon any of the exhibits. Appearing as a witness in her own behalf, defendant testified that on the afternoon in question, when the officers announced who they were, she immediately admitted them into the apartment; that when they started searching the premises she asked ''What in the world are you looking for?'' to which one of the city police officers replied ''Oh, I thought maybe you had some guns around here.'' The defendant testified that she continually asked ''What

is this all about?'' until finally Federal Inspector Marsh came in with the aforesaid paper package, saying "Well, this is it," or "I found it," to which, according to the defendant she stated "What is it?" She also testified that she did not know what it was. That when Inspector Marsh said "You know what it is" she replied "I beg your pardon, I don't know what it is." With reference to the lamp found under the red glass by one of the federal agents, defendant testified that when she was asked "Is this yours?" she replied "That is a little blackout lamp. I use it to burn perfume." With reference to what transpired at the office of the Federal Bureau of Narcotics, subsequent to her arrest, defendant testified "They told me to sit down" and Supervisor Manning said " 'We'll give you a break'." That thereupon Inspector Marsh said " 'If you will say that this belongs to you, we will let Dorothy Martin and Mr. Levenburg go'," to which, according to her testimony, she replied " 'How can I say it is mine, when it is not mine? . . . I have never seen it before in my life'." The defendant further testified that Miss Martin had a key to the apartment, that she had furnished her a key so that she could come in and out of the apartment whenever she desired. Defendant denied that she knew anything about the opium or any of the articles introduced in evidence and further denied that she ever told Inspector Marsh or anybody that she had been smoking opium for twelve years, and testified that she had never at any time smoked opium.

Inspector Marsh also testified with reference to certain of the exhibits being used for the smoking of opium and explained the manner in which they were used. We do not deem it necessary to a decision in this case to relate the substance of this testimony, except insofar as the same concerned the lamp found in the apartment of the defendant. The contents of this last named lamp were identified as peanut oil, which it was testified is a product used in the consumption of opium. Defendant contended that it was not peanut oil, but salad oil. After testifying to the number of years he had been a member of the Bureau of Narcotics of the United States Treasury Department, the numerous investigations concerning narcotic cases, opium and otherwise, he had made, and his familiarity with opium and the manner in which it was used by those who smoked or consumed it, Inspector Carpenter

described the lamp found in the apartment of the defendant as an "opium lamp," but he admitted that it could have been used as a "blackout lamp" as contended by the defendant.

When a judgment is assailed upon the ground that it is not supported by the evidence, the appellate tribunal is governed by the following rule announced in *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778] :

"The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and second, that it was perpetrated by the person or persons accused thereof. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (Citing cases.)

Therefore, if the evidence supports the inference that appellant was unlawfully in possession of the forbidden narcotics, the fact that it would likewise support a contrary finding does not warrant the reviewing court in setting aside the judgment on the ground of insufficiency of the evidence. Appellant places great reliance upon the case of *People* v. *Flores,* 58 Cal.App.2d 764 [137 P.2d 767]. All that was decided in that case was that as a matter of law there was no evidence, substantial or otherwise, that the crime in question had been committed by the defendant, or justifying an

inference of his guilt, and that therefore, the evidence of guilt was legally insufficient. But where the circumstances in evidence are such as to reasonably justify an inference of guilt as found by the court or jury, the fact that an inference of innocence might also just as reasonably be predicated upon such circumstances does not present a question of law reviewable by an appellate court, and we would have no more right to disturb the jury's verdict or the court's decision than we would have in a case wherein the verdict or decision was based upon directly conflicting evidence. We must therefore examine the evidence in the case at bar, but unless we can say that the same obviously does not warrant the inference of guilt arrived at by the trial court, we are powerless to interfere, because to do so would be tantamount to a retrial of the case as arbiters of both law and fact. It requires no citation of authority for the statement that such is not the function of a reviewing court.

 In the case with which we are here concerned, appellant was charged with possession of narcotics. "Possession" of a chattel is established when it is shown that a person has physical control thereof with the intent to exercise such control, or having had such physical control, has not abandoned it and no other person has that possession (Rest., Torts, § 216). The statute does not require "proof of possession" at the very time of arrest (*People* v. *Belli*, 127 Cal.App. 269, 271 [15 P.2d 809]), nor is it necessary to prove that the accused had the unlawful article on his person (*People* v. *Sinclair*, 129 Cal.App. 320, 322 [19 P.2d 23]). The question therefore arises, does the evidence in the case before us establish the fact that "possession" of the narcotics was immediate and exclusive and under the dominion and control of appellant. The narcotics were found in a lightwell 2½ feet from an open window leading from the bathroom in appellant's apartment and were accessible to a person leaning out of the window in such bathroom and reaching therefrom into the lightwell, while the narcotics were some five feet distant from the window into the bathroom of the adjoining apartment numbered 102. Then there was the small lamp found in the kitchen of appellant's apartment under a colored glass. The contents of the lamp were identified as peanut oil, which an expert witness testified was a product used in the consumption of opium, while the same witness characterized the

lamp in question as an "opium lamp," although he conceded it could have been used as a "blackout lamp," and the appellant testified it was a "hurricane lamp" which she "used to burn perfume" and that it contained salad oil. But the court was warranted in assuming that if used as a "blackout" lamp some product other than a slow burning oil such as peanut oil or even salad oil would have been used to fuel it. Added to the foregoing, is the statement of the appellant when asked if the opium was hers "Well, what else can I say? You found it right in my apartment, didn't you?", together with appellant's statement that "she had smoked opium for the past twelve or fifteen years off and on."

While appellant at the trial denied making these statements, the verity of testimony given in this regard was a question for the trial court. And, unless the record discloses that the testimony given in contradiction of that offered by appellant is inherently improbable it is not competent for the appellate court to pass upon the credibility of the witnesses.

Taking all the facts into consideration, together with the statements made by the defendant, they certainly show more than a suspicion of guilt, and constitute sufficient evidence to sustain the inference made by the trial judge that the defendant was immediately and exclusively in possession and control of the narcotics.

The judgment and the order denying defendant's motion for a new trial are, and each of them is, therefore affirmed.

York, P. J., and Doran, J., concurred.