[Crim. No. 2320.   Third Dist.   Feb. 8, 1952.]

THE PEOPLE, Respondent, v. BRUCE PETREE, Defendant; BIRCHIE H. JORDAN, Appellant.

Russell F. Milham for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

ADAMS, P. J.—Appellant Jordan and one Bruce Petree were charged with and convicted of the murder of Robert M. Davidson. The jury fixed the punishment at life imprisonment. No motion for a new trial was made, and Petree has not appealed. The record shows that though the offense was committed October 12, 1949, and the officers of the law were advised of it immediately, no information was filed until May 18, 1951, some 19 months thereafter, though Petree had

been identified by the parties present in the Clarksville store long before.

Jordan's contention is that the verdict of the jury against him was based solely upon the uncorroborated testimony of Alfred F. Peterson, who admitted that he was an accomplice, but who was not charged along with Jordan and Petree, but was used as a witness for the State against them. The sole question before us is whether there was sufficient corroboration of Peterson's testimony to sustain the verdict and judgment.

Davidson was shot by defendant Petree when the latter alone held up the Clarksville store in El Dorado County the evening of. October 12, 1949. The evidence shows that as Petree was backing out of the store after robbing the proprietor and warning everyone to stay still for three minutes, Davidson, who was sitting at a counter drinking a glass of beer, made some slight movement, whereupon Petree shot and killed him, then fled in an automobile parked outside the store. There were five other people in the store at the time but no one saw or heard anyone except Petree.

Peterson testified as follows: On the night preceding the murder, he and Petree burglarized Fisher's Hardware Store in Placerville and stole a pump gun, three .22 rifles and a .38 target pistol. These guns were wrapped in an old blanket and hidden near the golf course. On the afternoon of October 12, 1949, the date of the murder, Peterson met Petree about 4 o'clock. They drove to Diamond Springs in Petree's Ford coupé, where they picked up Jordan. All three drove to the golf course and Peterson got out and from the gun cache procured a .22 pump rifle and the .38 pistol. They discussed the proposed holdup which was the reason for getting the guns. Petree stopped his car across the street from the Diamond Hardware Store and Jordan secured a box of .38 shells. On their way back Petree stopped the car and Jordan got out and set a beer can on a fence post and then returned to the car and fired the pistol at the beer can. They then drove to Clarksville, where the car was parked about 100 yards from the Clarksville store. It was dark and the lights in the store were burning. Jordan and Petree left the car and Jordan stated that Petree had better go into the store as the people who owned it knew Jordan. Peterson was told to slide under the steering wheel of the car; the motor was kept running but the lights of the car were turned off. Jordan was wearing a brown hat which he gave to Petree to wear, and Petree put

on a brown army jacket with a hole burnt in the sleeve, which was behind the car seat. Petree took the .38 pistol and Jordan the rifle and they both went toward the store. Within a minute or two Peterson heard two or three shots, and Petree and Jordan ran back to the car with the guns in their hands. When they entered the car Petree said he had shot someone. They drove away at about 95 miles an hour down the highway toward Perkins and then turned off on the Jackson road. Jordan talked of getting rid of the rifle and pistol. Between Clarksville and Waite's Station in Amador County, Petree gave Peterson $6.00 in paper money and gave Jordan the same amount or more. During this time the .22 rifle went off accidentally and shot a hole through the roof of the car. Jordan threw the pistol and shells out of the car just before they came to the Consumnes River bridge; the rifle was thrown out after they crossed the bridge on the Jackson side. The army jacket was thrown from the car while on the bridge. It hung up on the bridge rail and the car was stopped while Jordan got out, went back, and threw the jacket into the river. (None of these discarded articles was ever recovered.) They then drove to Drytown and then to Martell where they stopped for beer. They went on into Jackson where they ate, Jordan did some gambling and they had some drinks. Then they drove to Plymouth and on to El Dorado where Jordan left the car and told them not to say anything about what transpired. Petree and Peterson drove back to Diamond Springs about 11 p. m. and Peterson went to Petree's house where he was having some coffee when a deputy sheriff arrived.

Respondent, contending that Peterson's testimony finds corroboration in the record, states in its brief:

"Here the *corpus delicti* of the robbery and murder was testified to by the customers of the Clarksville Store, as well as the proprietor and his daughter. The defendant Petree was likewise positively identified as being on the scene and committing the robbery and the murder. The witnesses described him as wearing a brown hat and an army jacket at that time. Defendant Jordan admitted that on that evening he had been wearing a brown felt hat and that Petree was not wearing one. Petree himself admitted that he had possessed an old jacket, which he had formerly used to cover his car. The customers at the store testified to the effect that the robber had a gun which looked new. Arthur Fisher testified that the previous evening—October 11—his store had been burglarized and several guns were taken, among which were

a Colt .38 revolver and a pump gun. The expert witnesses testified that the bullets found in the Clarksville Store as an aftermath of the shooting had been fired from a new .38 Colt revolver, and the remaining guns stolen from Fisher's store were recovered from a shaft some two years later, where Peterson told the officers they could be found.

"Both Petree and Jordan admitted they were together with Peterson on the night of October 12, 1949; however, although they admitted being together from approximately 4:30 to 5 p. m. and from 6:45 to 11 p. m., they denied being in the vicinity of Clarksville, or participating in either the murder or robbery. In previous statements given to the police officers on October 26, 1949, and November 1, 1949, they had admitted being together from around 6 p. m. on until 11 p. m."

The prosecution then drew the conclusion that there was sufficient corroboration of the testimony of Peterson, saying:

"In the case at bar, the defendant and appellant Jordan by his own testimony placed himself with Peterson his *nephew,* [sic] and Petree on the night of October 12, 1949. As to the time when the three were together he told conflicting stories to the officers and only fixed the time at 10 minutes to 7 when he took the witness stand. He admitted that the three men went to Jackson in Petree's car on the night in question; that he was wearing a brown hat at the time and Petree no hat. It is apparent that this testimony was sufficient to corroborate the testimony of Peterson the accomplice, and support the finding that the defendant and appellant was connected with the commission of the offense, and the testimony of his accomplice as to his participation in the offense was true."

Section 1111 of the Penal Code provides that a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

While this court held in *People* v. *Griffin,* 98 Cal.App.2d 1 [219 P.2d 519], that it is not necessary that the corroborative evidence prove independently that the defendant is guilty or that it extend to all of the elements of the offense; that circumstantial evidence may suffice; and that corroborative evidence may be sufficient, even though slight, if the connection of the defendant with the crime reasonably may be inferred therefrom, we also said that such corroborative evi-

dence must do more than merely raise a suspicion of guilt, even a grave suspicion; it must tend to connect the defendant with the commission of the offense.

■ We are not satisfied that in the instant case the mere fact that Jordan was wearing a brown hat the day of the homicide and Petree was wearing no hat, or that Jordan told conflicting stories to the officers as to the time he joined Peterson and Petree that evening, is sufficient corroboration of Peterson's story to justify the conviction of Jordan of murder. There is no independent evidence that Jordan was with Petree and Peterson when the crime was committed, nor do such conflicts in his statements to officers as to the time he joined them that evening show that he was with them at any particular time. Though such conflicting statements may have tended to discredit him as a witness, they are not evidence of the fact as to when he did join Peterson and Petree that evening.

In section 31 of the Penal Code principals are defined as all persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission. The corroborating evidence relied upon does not tend to show any of these things.

Pertinent cases in which the corroborating evidence was held to be insufficient are: *People* v. *Braun*, 31 Cal.App.2d 593 [88 P.2d 728] ; *People* v. *Reingold*, 87 Cal.App.2d 382 et seq. [197 P.2d 175] (hearing by Supreme Court in both cases denied) ; *People* v. *Shaw*, 17 Cal.2d 778 [112 P.2d 241] ; *People* v. *Lima*, 25 Cal.2d 573, 579 [154 P.2d 698] ; *People* v. *Davis*, 210 Cal. 540 [293 P. 32] ; in all of which judgments of conviction were reversed.

■ If section 1111 of the Penal Code is to be of any effect it should not be whittled away until the mere shadow remains, nor parties charged with such crimes as murder, convicted on the testimony of accomplices without corroboration that, as we said in *People* v. *Griffin, supra,* at page 28, does more than raise a suspicion of guilt, even a grave suspicion. ■ It must tend to connect the defendant with the commission of the crime charged.

The judgment against appellant is reversed and a new trial ordered.

Peek, J., and Van Dyke, J., concurred.