[Crim. No. 4952.   Second Dist., Div. One.   July 20, 1953.]

THE PEOPLE, Respondent, v. NORMAN KENNETH
BRICKMAN, Appellant.

A. Brian Weinberg for Appellant.

Edmund G. Brown, Attorney General, and Alan R. Woodard, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, defendant was charged with the offense of having in his possession flowering tops and leaves of Indian hemp (*cannabis sativa*), in violation of section 11500 of the Health and Safety Code.

Following the entry of a plea of not guilty the cause proceeded to trial before a jury which returned a verdict finding the defendant guilty of the charge filed against him. His motion for a new trial was denied and he was sentenced to a term of 90 days in the county jail.

From the judgment of conviction and from the order

denying his motion for a new trial, defendant prosecutes this appeal.

Epitomizing the factual background of this prosecution, the record reflects that defendant was a young man 19 years of age. While his mother was confined in a hospital he left the family house after a quarrel with his father. He became associated with three older men named Robert Douthit, Mickey Avrutine and Charles Castle.

On April 6, 1952, defendant and the foregoing three men rented from Mrs. Lydia McNulty, and moved into a cottage-type apartment at 1141½ 18th Street in the city of Santa Monica, California. The receipt for the rent deposit paid was made out to defendant. After the first week, the wife of Charles Castle moved into the apartment and a week later another man also moved in.

Approximately one week prior to May 4th, Mrs. McNulty, the landlady, saw Mrs. Castle come out into the yard carrying newspapers and a number of dried stalks in a large bag which she placed in the barbecue pit. These stalks were subsequently burned in the incinerator by Mrs. McNulty.

Becoming dissatisfied with her tenants, Mrs. McNulty, on April 30th, apprised them of this fact and advised them to vacate when their month was up.

On Friday evening, May 2d, Mrs. McNulty saw her tenants moving out. On that occasion she noticed defendant go back into the apartment after helping to carry out some bags. However, defendant departed that same evening about 8:30 o'clock and went to the Wisconsin Hotel where he spent the following two nights with a friend. Between Friday night and Sunday afternoon, Mrs. McNulty did not see anyone in or about the apartment.

On Sunday, May 4th, Mrs. McNulty went into the apartment to get the linens off the beds for washing. In pulling the sheets off the bed in the rear bedroom she heard a thud on the floor. Upon investigating, she found a pair of blue jeans and a C & H sugar bag containing a white sandwich bag, with leafy contents and four No. 6 brown manila bags, each containing a similar white bag and leafy contents. She returned to her own house, talked to her husband about what she had found, and they decided to call the police.

Shortly after receiving this call, Captain Reinbold and Officer Askew of the Santa Monica Police Department, arrived at the McNulty residence. They spoke to Mr. and Mrs. McNulty in the front house, observed the C & H sugar bag

and the contents thereof on the dining room table and then went to the rear house, taking the sugar bag with them. They went into the rear bedroom, where they found the blue jeans. Officer Askew was left at the rear house, vacated by defendant and the other tenants, with one of the brown paper sacks. The front door was locked, and Captain Reinbold and the McNultys left. Reinbold returned directly to police headquarters where he locked the sugar bag in his desk drawer.

At approximately 4:40 p. m. on the same day, Officer Rydgren joined Officers Askew and Gomez inside the rear house. Askew left at this time and approximately half an hour later defendant returned with a young lady, at which time he was placed under arrest. Shortly thereafter, two other officers came and took defendant and the girl to headquarters. Defendant stated that he came back to the house for the purpose of picking up a toy monkey and a book he had forgotten.

At police headquarters defendant was questioned that evening by Officer Askew. They then went to the Wisconsin Hotel in Ocean Park and found two suitcases and some boxes belonging to defendant. During this conversation, defendant denied that the narcotics were his. He admitted that the girl accompanying him was the sister of one Bonner Brown, a "narcotics pusher" in the Ocean Park area. He had known the girl for several years but stated that he had not been with her before. That he had met her at a café in Ocean Park during the afternoon and invited her to accompany him.

Castle, Douthit and Avrutine were arrested when they returned to the house at about 2 a. m. on May 5th.

On the morning of Monday, May 5, 1952, Officers Hillaiel and Askew returned to 1141½ 18th Street and conducted a search of the premises, which disclosed 27 marihuana cigarettes in a clothespin bag hanging in the kitchen. They then returned to headquarters and questioned the persons in custody. At approximately 1:30 they questioned each of the suspects individually. The statements made by defendant at this time were given freely and voluntarily, no force or violence was visited upon his person, nor were any promises of reward or immunity made. Defendant asked, "What will I get?" When he was told that he would have to go to court he denied that the "stuff" was his. Castle was then questioned individually for about 40 minutes and then defendant was brought back into the room, at which time a conversation

was had between defendant, Castle and Officers Hillaiel and Askew. Castle began the conversation:

". . . Norm, why don't you tell these guys the truth about this marijuana business? After all, I wasn't there. I took my wife, as you know, with Avrutine and Douthit—I rented a car, and we took my wife back to ———" Officer Hillaiel testified that he thought it was Phoenix, Arizona.

". . . Now, somebody planted that stuff in my pants, and I don't like the idea. I am P.O.'d. Come out and tell them the truth. It will make it easier on you and everybody else for them to know the truth . . . After all, I don't like the idea of your going ahead and taking the stalks and the weeds and breaking them up and giving them to my wife and having my wife go out to the incinerator to burn that evidence. That takes a pretty low skunk to do a thing like that, I don't like it at all. I am here. Tell these officers the truth."

In response to these statements, defendant said:

". . . I am sorry, Castle. It is all my fault. I did it. I am responsible for the whole thing. You have nothing to do with it. Avrutine hasn't anything to do with it, and Douthit hasn't a thing to do with it. It is all my stuff, and I am responsible for it being there."

Castle was then taken out of the room and defendant continued to talk. He said he had made a contact down at the south side of town at a cocktail lounge where a man approached him and asked if he wanted to buy "a little stuff." When defendant indicated that he did, he was given a phone number, which he called. He was told over the phone to enclose $100 in an envelope and put it alongside his house at a certain spot near the alley. Defendant then continued:

". . . I got myself $100 and put it in the envelope, I stashed it on the lawn near the shrubbery. After I entered the house, I didn't look out. I just stayed in the house. Within about an hour later or two hours later, I walked right out there, and there they were. There was $200 worth of stuff there."

When asked how it was received, defendant replied:

". . . I received it in three manila large bags . . . There was stalks, leaves, and weeds. I took it into the place there. Then I took the leaves off of the weeds. I took myself a bowl and started grinding the stuff.

"I got working on the stuff, and I took my little sandwich wax paper bags, and I filled each and every one of these bags with approximately a can of Prince Albert, the amount that

would be in a Prince Albert can. I took some scotch tape and flipped the lids over and put it in the other sacks and then I started rolling my sticks.

"I rolled many of them and then I would take some scotch tape and I would secure 3 sticks in a bundle." Defendant also admitted that he had rolled the 27 cigarettes.

When asked how much he was selling the "stuff" for, he said, "Well, truthfully, I got caught too quick. I was going to sell three for a deuce, three for two dollars. I was going to sell my package goods in the rough. I was going to sell those from ten to fifteen dollars apiece. I figured out what I had split up with a friend of mine, a couple of boys from the Ocean Park area. I split my stuff with them. I was going to make around $150 out of my share of the stuff."

Defendant then stated that he had planted the "stuff" in Castle's trousers. He indicated that he had tried using it in the past but that this was his first attempt at "pushing" it. Defendant stated that the reason the "stuff" was still in the house was that it wasn't moving very fast. Defendant admitted that he put the C & H sugar bag in Castle's pants because there was no other place to hide it.

At the trial, defendant denied that any of the foregoing contraband was his or that he had ever admitted possession or knowledge thereof to the officers.

At the trial, Jesse Klein, an investigator in the office of the district attorney, testified that he had received subpoenas on June 23, 1952, and had been directed to serve them on Robert Douthit, Charles L. Castle and Murray Robert Avrutine.

His efforts to serve Douthit consisted of going to the Metropole Hotel on June 23d. The register there revealed that Douthit had been registered there for about a week and had been gone two weeks prior to this date. He checked with the Douglas Aircraft Company to see if he had been employed there as a machinist and ascertained that Douthit had worked for Douglas but left February 20, 1952, and had not been employed there since. Klein also checked with the registrar of voters in Los Angeles County, and also checked a license number that had been registered in the report of the police officers. He learned that the vehicle in question was registered to one W. J. Gunkle, 2120 Wilshire Boulevard. A check was made of the telephone directories of the Santa Monica, Central and South Districts; furthermore, Klein checked with the Santa Monica Police Department, the Venice Police Department and West Los Angeles Police Department. He

also conferred with Mrs. McNulty but received no information which was of any help. A check was also made with the investigating officers. The machinist's union was contacted and they had an old address on Douthit, which they refused to disclose as being against their policy. An inquiry was also made at the post office where all three names were checked; however, the postal authorities would give out no information as to addresses.

The efforts to locate Charles L. Castle consisted of checking the Pier Avenue Apartments in Ocean Park, which had been given at the preliminary hearing as his address. The register showed that he had never been registered there. The registrar of voters and the records of the Motor Vehicle Department were checked. Klein ascertained that Castle had worked for Douglas Aircraft Company but had left there April 22, 1952. Castle had also been registered with the machinist's union but they refused to give any addresses. A check was also made of the various telephone directories and with the police departments, as well as the Santa Monica directory. The addresses given by Douthit and Castle were checked several times but neither had been back to either the Metropole Hotel or the Pier Avenue Apartments.

In his attempt to locate Murray Robert Avrutine, Klein checked with the Metropole Hotel and found that Avrutine had registered there along with Douthit under the name of Hirshberg. Inquiry was made at Diamond Distributors, 2110 S. Pico in Santa Monica, where he had worked as a diamond cutter; however, that organization was closed and the telephone was disconnected. A further check was made with the registrar of voters, the Motor Vehicle Department, the telephone directories, three police departments in the locality, and the Santa Monica directory.

Neither Douthit nor Avrutine had left any forwarding addresses when they left the Metropole. Klein's investigation did not reveal that Castle had a brother living in the area. He did notice a reference in the files to Phoenix, Arizona, but no inquiry was made at that address since it was out of state. No check was made at the other hotels in the Venice and Ocean Park areas. The Diamond Distributors' office was checked four different times in an effort to find Avrutine but to no avail. No effort was made to check the license for the business or to run it down in the business directory. Officer Gomez had seen Charles Castle in a shoot-

ing gallery about three or four weeks prior to the trial, but Klein had been led to believe that Gomez had not seen any of the other men and did not know where they were.

Mervin A. Aggeler, deputy district attorney, testified that he questioned defendant's counsel on July 30, 1952, and was told that the defense had not subpoenaed Castle, Douthit and Avrutine and that defense counsel did not know where they were.

A discussion between counsel for the defendant and the court then took place, at the conclusion of which the court ruled that a sufficient showing had been made to justify reading the testimony of Castle, Douthit and Avrutine given at the preliminary hearing.

Deputy District Attorney Aggeler then took the stand and read such testimony from the reporter's transcript of the preliminary hearing in this matter.

At the preliminary hearing, Robert Douthit testified that he had previously seen marijuana on the stalk. On Thursday, May 1st, he saw something that resembled marijuana on the stalk in defendant's possession at the apartment on 18th Street. Defendant was sitting at the kitchen table alone, with some large bags of something resembling marijuana. Douthit told him that he thought it was marijuana and that he should get it out of the house. Defendant said that was all right. He did not say where he had gotten the marijuana or what he had paid for it. At that time there was a bowl on the table resembling a fruit bowl containing material that looked similar to marijuana. Douthit went to bed and the material was not on the table when he got up the next morning. Douthit had been drinking that evening.

Charles Castle testified that he came into the house with Douthit on the night of May 1st. He also saw the paper sacks sitting on the table but he didn't pay very close attention to what was in the sacks nor did he hear the conversation between defendant and Douthit. He did not see these sacks upon arising the next morning. He also had been drinking that evening. Castle was present at the questioning of defendant on May 5th when the latter said that he had put the marijuana in Castle's pants. That during the last part of April and the first part of May, Castle had no marijuana in his possession or under his control.

Murray Robert Avrutine testified that he had never possessed or had under his control any marijuana during the time he lived at 1141½ 18th Street.

Clifford C. Cromp, a chemist in the sheriff's crime laboratory, testified that he had received the People's exhibits from Officers Askew and Gomez on the morning of May 5th. That he analyzed the contents of the bags comprising those exhibits and found the green leafy material therein to be marijuana. The 27 cigarettes were also examined and found to contain marijuana. He kept all of the evidence submitted to him for examination in his custody until the preliminary hearing, at which time it was surrendered in court.

It is first contended by appellant that the court committed prejudicial error in permitting the prosecution to read into evidence over his objection the testimony of Castle, Douthit and Avrutine given at the preliminary examination. Such procedure is governed by section 686 of the Penal Code which, insofar as here material, provides:

"In a criminal action the defendant is entitled:

". . . . . . . . . . . .

"3. To produce witnesses on his behalf and to be confronted with the witnesses against him, in the presence of the court, except that where the charge has been preliminarily examined before a committing magistrate and the testimony taken down by question and answer in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness; . . . the deposition of such witness may be read, upon its being satisfactorily shown to the court that he . . . cannot with due diligence be found within the state; . . ."

It is largely within the discretion of the trial court to determine what constitutes due diligence to secure the presence of a witness which will authorize the reading to the jury of testimony given at the preliminary examination, and such determination depends upon the facts of each particular case. Unless it appears that the decision of the trial judge on the question of diligence and of the propriety of receiving or rejecting the evidence, was an abuse of discretion, it will not be disturbed on appeal (*People* v. *Cavazos*, 25 Cal.2d 198, 200, 201 [153 P.2d 177] ; *People* v. *Centers*, 56 Cal.App.2d 631, 633, 634 [133 P.2d 29]).

In the instant case we have hereinbefore narrated the efforts made by the district attorney's investigator to locate and serve subpoenas upon the absent witnesses and it is unnecessary to here repeat them.

The trial was set for July 29, 1952. The subpoenas were received by the investigator on June 23, 1952. During that

interim several attempts were made as aforesaid to contact the witnesses, the last such attempt being made July 29, the day before Investigator Klein testified.

Suffice it to say that in the case at bar there was evidence of a substantial character to support the conclusion of the trial court, and its conclusion was not therefore an abuse of discretion.

Appellant directs our attention to several cases in which it was held that the showing of due diligence was inadequate to warrant the reception of such evidence. However, not only are such cases distinguishable from a factual standpoint, from the case now engaging our attention, but other cases are not particularly helpful, because as heretofore pointed out, the problem is one primarily for the trial court, and in the final analysis must be solved in accordance with the facts of each individual case.

Appellant next urges that the witnesses Castle, Douthit and Avrutine were accomplices, and that their testimony given at the preliminary examination and read to the jury at the trial was not corroborated by other evidence tending to connect appellant with the commission of the crime charged (Pen. Code, § 1111).

Conceding, but not deciding, that the aforesaid three witnesses were accomplices, we are persuaded that their testimony was amply corroborated.

The above mentioned extrajudicial declarations of appellant, tending as they did to connect him with the commission of the crime charged, constituted sufficient corroboration to sustain the conviction (*People* v. *Briley,* 9 Cal.App.2d 84, 86 [48 P.2d 734] ; *People* v. *Mastrantuono,* 88 Cal.App.2d 178, 183 [198 P.2d 574]). In the cases of *People* v. *Reingold,* 87 Cal.App.2d 382 [197 P.2d 175], and *People* v. *Petree,* 109 Cal.App.2d 184 [240 P.2d 327], cited by appellant, there were no admissions by the accused such as those disclosed by the record in the case at bar.

Appellant insists that the evidence is insufficient to support the judgment of conviction in that there is no showing that he ''possessed'' the marijuana in question. In the case of *People* v. *Johnston,* 73 Cal.App.2d 488 [166 P.2d 633] cited by appellant, the court at page 492 quotes with approval the following language found in *People* v. *Bassett,* 68 Cal.App.2d 241, 247 [156 P.2d 457] :

''. . . 'Possession' of a chattel is established when it is shown that a person has physical control thereof with the

intent to exercise such control, or having had such physical control, has not abandoned it and no other person has that possession. (Rest., Torts, § 216.) *The statute does not require 'proof of possession' at the very time of arrest (People* v. *Belli,* 127 Cal.App. 269, 271 [15 P.2d 809]), *nor is it necessary to prove that the accused had the unlawful article on his person (People* v. *Sinclair,* 129 Cal.App. 320, 322 [19 P.2d 23]).'' (Emphasis added.)

In the case now before us, the record reflects that appellant admitted to the police officers that he had purchased the marijuana; that he had planned to resell it, and that he had placed it in Castle's trousers because there was no other place to hide it. He also stated that the reason the marijuana was still in the house was that ''it wasn't moving very fast.''

When these statements are considered with other evidence in the case, and looking at all the evidence in a light most favorable to the prosecution, as we must do on appeal in a criminal case (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Kristy,* 111 Cal.App.2d 695, 698 [245 P.2d 547]) the conclusion seems inevitable that appellant had possession of the marijuana and that such possession had not been abandoned.

The claim that the evidence was insufficient to show that appellant had knowledge of the presence of the marijuana in the house in question is equally devoid of merit. Undoubtedly, the element of knowledge of the existence of the object is essential to ''physical control'' thereof with the intent to exercise such control, and as was said in *People* v. *Gory,* 28 Cal.2d 450, 455 [170 P.2d 433]: ''. . . and such knowledge must necessarily precede the intent to exercise, or the exercise of, such control.'' In the instant case, all the essential requirements were supplied by the ''express admissions and statements made by defendant with respect to the possession of narcotics, which supplied the final link in the chain of circumstances connecting defendant with the offense charged against him'' (*People* v. *Gory, supra,* p. 456). And, as was said in *People* v. *Foster,* 115 Cal.App.2d 866, 868 [253 P.2d 50]: ''To show such knowing possession the conduct of the parties, *admissions* or contradictory statements and explanations are frequently sufficient'' (citing cases). (Emphasis added.) In the case at bar there was abundant evidence, judged by the foregoing rules, to support findings of possession and a knowledge thereof.

Finally, appellant contends that the court committed prejudicial error in failing to instruct the jury that the testimony of the accomplices ought to be viewed with distrust and that before they could find the accused guilty, the jury must be convinced beyond a reasonable doubt that he had knowledge of the existence of the marijuana.

The instructions given and refused have not been brought here on this appeal. ██ It is the rule that instructions must be considered in their entirety. Consequently, where the record on appeal does not contain the instructions given, we are unable to consider appellant's challenge to their correctness. ██ The correctness of instructions not incorporated in the record must be presumed and will not be reviewed (*People* v. *Frye,* 117 Cal.App.2d 101, 108 [255 P.2d 105]). ██ Furthermore, conceding it was the duty of the court of its own motion, without any request by appellant, to instruct the jury with reference to accomplices and their testimony (*People* v. *Crain,* 102 Cal.App.2d 566, 582 [228 P.2d 307]; *People* v. *Ahern,* 113 Cal.App.2d 746, 749 [249 P.2d 63]), and that no such instruction was given, we are convinced that the jury could only have returned the verdict they did, had proper cautionary instructions been given. This we say because the testimony of the claimed accomplices was corroborated by the police officers and by admissions of appellant himself (Cal. Const., art. VI, § 4½).

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are and each is affirmed.

Doran, J., and Scott (Robert H.), J. pro tem., concurred.