[Crim. No. 5455. Second Dist., Div. Two. May 14, 1956.]

THE PEOPLE, Respondent, v. JEREMIAH
K. DENNE, Appellant.

502

Jeremiah K. Denne, in pro. per., and David E. Agnew, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

FOX, J.—Defendant was charged, in an amended information, with violation of section 11500 of the Health and Safety Code in that he unlawfully had marijuana in his possession. He pleaded not guilty. He was also charged with two prior felony convictions, to wit, a violation of section 503 of the Vehicle Code and a violation of section 11500 of the Health and Safety Code, both of which he admitted. A trial by jury resulted in a verdict finding defendant guilty of the offense charged. His motion for a new trial was denied and defendant was sentenced to a term in the state prison. He appeals from the judgment of conviction and the order denying his motion for a new trial.

Defendant's principal contention is that prejudicial error was committed by the trial court in permitting the introduction of evidence seized in the course of an unreasonable search of his premises of the character condemned in *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905]. However, an examination of the particular and peculiar circumstances of the case at bar makes manifest the inapplicability of the exclusionary rule enunciated in the Cahan case.

In July, 1951, defendant was convicted on two counts of violating section 11500 of the Health and Safety Code (possession of marijuana and heroin) and was sent to the state prison.[1] On about April 12, 1954, defendant was released on parole. The Adult Authority made the continuance of his parole subject to certain conditions, these providing, in part, that defendant "may not possess, use or sell any narcotics in violation of law," and that he must avoid "'former inmates of penal institutions and individuals of bad reputations." Provision 12 of the articles of parole informed defendant that "Your civil rights have been suspended. Therefore you may not enter into any contract, marry, engage in business or execute a contract without the restoration of such civil rights by the Adult Authority."[2]

Following his admission to parole, defendant obtained employment. In October, 1954, parole officer Haydis took over

---

[1]He had previously served time in the state prison following conviction for violating section 503, Vehicle Code (grand theft-auto).

[2]The following civil rights were restored to defendant:

(a) To rent a habitation and to make such purchases of food, clothing, transportation and tools necessary for his maintenance and holding a job.

(b) His rights under Workmen's Compensation, Unemployment Insurance Laws, Social Security Laws and other statutes relating to employees.

the supervision of defendant's activities as a parolee and in the next six months he had about 15 personal visits with defendant. As the result of these contacts, Parole Officer Haydis entertained the view that defendant was making satisfactory progress in his pattern of readjustment to society. In March, 1955, defendant secured swing-shift employment (4 p. m. to midnight) on the assembly line of an automobile plant in South Gate, California. Shortly thereafter disquieting information about defendant reached Haydis.

Late in the afternoon of March 25, 1955, Haydis met with another parole officer named Lyons, with whom he planned to work on official business that night. Lyons had under his supervision a parolee named Martin Leonard, whom he had transported to the Los Angeles County Jail earlier that month. Leonard had admitted to Lyons that he was trafficking in narcotics. Among Leonard's personal effects was found a picture of defendant. Leonard told Lyons that he knew defendant, that he was aware that defendant was a parolee, and had several times attended parties at defendant's apartment. Lyons recounted these facts to Haydis while they were having dinner together and showed him the picture of defendant which had been taken from Leonard's possession. Haydis thereupon requested Lyons to accompany him to defendant's home for the purpose of taking him into physical custody for violation of the conditions of parole.

The parole officers arrived at the apartment building in which defendant resided between 8:30 and 9 p. m. His quarters were dark when the officers rang his doorbell and received no response. They then inquired of the building manager, Jack Williams, about whether defendant was at home. Mr. Williams stated he wasn't sure, though he understood defendant was ill and did not go to work that day. The officers again tried to gain admission by knocking on the door but failing, returned to Williams' apartment and asked permission to enter defendant's apartment. Williams stated he would get the key to the apartment but then discovered he could not locate it. Accompanied by the officers, he went to a window at the rear of the apartment. Standing first on a garbage pail and then on a tool shed, Williams inserted a screw driver under the sill to raise the unfastened window and then climbed into the apartment. Haydis and Lyons returned to the front door where they were admitted by Williams.

The officers first inspected the apartment looking for defendant and ascertained he was not present. In the presence

of Williams, they then undertook a search of each room of the apartment. In a cabinet drawer in the kitchen Lyons found a package whose contents he examined and recognized as marijuana.[3] After completing their search, they went to defendant's place of employment and at about midnight took him into custody. He was subsequently transferred to the county jail.

When defendant was awaiting trial he wrote a letter to Parole Officer Haydis stating he had just been informed that the girl with whom he was keeping company had been made pregnant by him. The letter, received in evidence over defendant's general objection, continued: "You see, now I don't know what to do about my case. I had intentions of having a jury trial and take a chance. But now I've [sic] thinking of having a court trial and take a chance of getting county jail time and hope I get put back on parole and get married. Like I said, it was found in my possession and possession is nine tenths of the law. But I was wondering if there's anything you can do to help me. Mr. Haydis, as of now I have just made up my mind. On May 13, I am going to change my plea to guilty and leave the rest up to the judge. And if there's any way you can help me get county jail time, I would appreciate it very much . . ." Haydis visited defendant at the jail a week later and advised him not to plead guilty to anything he did not do.

At the trial, the marijuana found in defendant's apartment was admitted over his objection that it was illegally seized pursuant to an unconstitutional search. He admitted that he had used marijuana subsequent to his admission to parole but stated he had discontinued the practice because of his intention to marry. He explained his letter to Haydis was written after he learned of his girl friend's pregnancy. He testified, "I figured I would throw myself on the mercy of the court and pray that I would get county jail, and I was hoping that I would get out in about six months before the baby was born and get a job and save a few dollars and then get married." Martin Leonard, called as a witness by defendant, testified that he had originally met defendant when they were prison inmates. He stated that it was he who placed the marijuana found in defendant's apartment in the kitchen drawer. He testified he did so on March 10, 1955, when he

---

[3]It was stipulated at the trial that if called to testify Ralph Simonds, a forensic chemist, would give as his opinion that the substance discovered by the officers in defendant's room was marijuana.

broke into defendant's apartment by way of the rear window when no one was at home. He never told defendant what he had done. He stated that he had been to defendant's apartment previously on five or six occasions when one Robert Miller was sharing the flat with defendant. His visits were for the purpose of seeing Miller.

Relying on *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905], defendant predicates his main argument for reversal upon the premise that the marijuana found in his apartment was legally inadmissible evidence, being the product of an unreasonable search and seizure in violation of his rights under the Fourth Amendment of the United States Constitution. We need not express our views on, nor here decide, whether the protection of the Fourth Amendment, born of the jealous regard of a *free people* to preserve their civil liberties and rights of privacy against invasions effectuated under color of police or governmental authority, extends to a convict serving the unexpired portion of his sentence on parole from a penal institution. Anomalous as it may appear, we will assume, *arguendo,* that the guarantees of the Fourth Amendment apply to such a person. (See *Martin* v. *United States,* 183 F.2d 436.) ■ But the constitutional immunity embodied therein is granted not against all searches and seizures but only against those which are "unreasonable." (U. S. Const., IV Amend.; Cal. Constitution, Art. I, § 19; *People* v. *Winston,* 46 Cal.2d 151, 161-162 [293 P.2d 40]; *People* v. *Coleman,* 134 Cal.App.2d 594, 599 [286 P.2d 582].) Thus the crucial question presented is whether the search and seizure conducted by the parole officers was unreasonable and therefore an infringement of defendant's right to be secure against such a search. ■ What constitutes a reasonable search cannot be encapsuled in any rigid formula, nor determined by any fixed standard or single touchstone. In declining to formulate any one test of the reasonableness of a search, the United States Supreme Court remarked, in *United States* v. *Rabinowitz,* 339 U.S. 56, 63 [70 S.Ct. 430, 94 L.Ed. 653]: "The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case." Commenting further on the ultimate legality of any particular search, the court said (p. 66): "The mandate of the Fourth Amendment is that the people shall be secure against unreasonable searches . . . The relevant test is . . . whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmos-

phere of the case.'' It is to the atmosphere of this case that we now address ourselves.

The situation in the instant matter differs significantly from that involved in the Cahan case, and all others decided since the adoption of the exclusionary rule, since the problem confronting the court in those cases was either the propriety of the arrest of a *private person,* with which the complained of search and seizure was conjoined, or whether the search incidental to the arrest of the private individual was reasonable or whether in the particular case the suspected person had apparently given his voluntary assent to the search.[4] The vital distinction here is that on the occasion of the search defendant was not an ordinary individual merely suspected of a crime but a convict on parole. ▆ A prisoner released on parole is not a free man. Section 3052 of the Penal Code provides that the Adult Authority shall have power to establish and enforce rules under which prisoners in state prisons, if found eligible, may be allowed to leave the prison enclosure on parole. ▆ In determining whether the privilege of parole shall be granted a prisoner, that authority is not guided solely by the good conduct of the prisoner while incarcerated. The nature of his offense, his age, his prior associations, his habits, inclinations and traits of character, the probability of his reformation and the interests of public security are all taken into consideration. (*Roberts* v. *Duffy,* 167 Cal. 629, 640 [140 P. 260]; *In re Harris,* 80 Cal.App.2d 173, 178 [181 P.2d 433].) Section 3056 of the Penal Code provides that prisoners on parole shall remain under the legal custody of the State Board of Prison Directors and shall be subject *at any time* to be taken back within the enclosure of the prison. ▆ A prisoner on parole is not free from legal restraint by the penal authorities (*In re Marzec,* 25 Cal. 2d 794, 797 [154 P.2d 873]) but ''is constructively a prisoner of the state in the legal custody and under the control of the state board of prison directors.'' (*In re Taylor,* 216 Cal. 113, 115 [13 P.2d 906]; *In re Heckman,* 90 Cal.App. 700, 706 [266 P. 585].)[5] ▆ The parole system, while humanitarian in

---

[4]Of the many cases decided by the Supreme Court since Cahan illustrative are: *People* v. *Brown,* 45 Cal.2d 640 [290 P.2d 528]; *People* v. *Boyles,* 45 Cal.2d 652 [290 P.2d 535]; *People* v. *Simon,* 45 Cal.2d 645 [290 P.2d 531]; *People* v. *Michael,* 45 Cal.2d 751 [290 P.2d 852]; *People* v. *Martin,* 45 Cal.2d 775 [290 P.2d 855]; *People* v. *Gorg,* 45 Cal.2d 776 [291 P.2d 469].)

[5]Having the civil status of a prisoner, a parolee is under the civil rights disabilities prescribed in section 2600 of the Penal Code. (*In re*

character, is reformatory in purpose. Its object is to mitigate the rigor of the former penitentiary system by allowing the prisoner to reenter society by replacing continued incarceration with a conditional freedom controlled by prison regulations. (*Matter of Stanton,* 169 Cal. 607, 610 [147 P. 264]; *Roberts* v. *Duffy, supra,* p. 634.) As stated in *Matter of Stanton, supra,* "In legal contemplation, therefore, he remains a prisoner, although out on parole. He is in the control of the board and subject to its rules, although otherwise at liberty."

From the statutes and cases last discussed, it is clear that the liberty accorded a parolee is partial and restricted. The granting of parole does not change his status as a prisoner. The parolee is not discharged but merely serves the remainder of his sentence outside rather than within the prison walls. The parole system, as an enlightened penological technique, enables him to pay his debt to society in a prison without bars. But he continues at all times to remain in penal custody, the same as the prisoner allowed the privilege of working on the prison's "honor farm." Parole has simply pushed back the prison walls for him, allowing him wider mobility and greater personal opportunity while serving his sentence. The additional liberty conferred on the parolee is the result of a decision of the Adult Authority, an administrative agency which is a component part of the Department of Corrections. (Pen. Code, §§ 5000-5003, 5075, 4810.) Rules and regulations for the conduct of paroled convicts are rules and regulations for the control of prisoners. (*Matter of Stanton, supra.*) The enforcement of these rules while the parolee is at large is the responsibility of the parole officer, a functionary of the administrative agency charged with supervising the conduct and charting the social progress of the parolee.

Because the public is entitled to maximum protection in the administration of the parole system, the process of rehabilitation takes place under the vigilant and tutelary eye of the parole officer. Unfortunately, recidivism on the part of parolees is not an uncommon occurrence. Many a vicious crime is committed by a parolee, shocking the faith of the public in the efficacy and desirability of parole. The parole officer, therefore, occupies a ubiquitous role in the life of

*Sanders,* 47 Cal.App. 368 [190 P. 647].) During the term of his parole the Adult Authority may restore certain civil rights to him if it deems proper. (Pen. Code, § 3054.)

the parolee. To him the parolee must report his movements and engagements, with him he must share his problems and from him he receives guidance to forestall backsliding into antisocial behavior. ■ Since the parolee constitutes a calculated risk to the security of the community, and since a breach of the faith reposed in him may subject him to summary return to the prison confines, the parole officer, in the nature of things, is accorded broad visitatorial powers over his prisoner. He must keep himself informed of the activities of the parolee and must guard against possible lapses that might jeopardize not only the uninterrupted freedom of the parolee and the interests of society but also the public acceptance and support of the parole system. His supervision of the parolee is of necessity a close one, since it bears strong analogy to that of a jailer to his prisoner, though the area of operations has been vastly extended.

■ These being the controlling factors, it cannot be said that the search of defendant's apartment by the parole officers was an unreasonable one. Having accepted a grant of parole, after conviction for possession of narcotics, defendant was by its express terms required to refrain from the use of marijuana and from association with former inmates of a state prison. The officers had received information that defendant was associating with a former felon named Leonard, who, by his own admission, was trafficking in narcotics. Haydis was specifically charged with keeping a surveillance over defendant, who in legal effect, was at all times in his custody as a prisoner and was subject at any time to be taken back to the prison (Pen. Code, § 3056.) Having reasonable cause to believe defendant had breached his conditions of parole by associating with a felon engaged in the narcotics traffic, the propriety of the search by the parole officers of their prisoner's quarters cannot be gainsaid. The basic reason which compelled our Supreme Court to adopt the exclusionary rule in the Cahan case—namely, to deter and discourage official circumvention of constitutional guarantees by refusing judicial sanction to the fruits of such conduct—has not been contravened in this context. By virtue of the status of the parolee as a prisoner of the state and in its constructive custody, and because of the unique relationship between a parole officer and his prisoner, under which the former must maintain a constant surveillance over his charge to assure himself that the conditions of the parole are being observed, the validity of the search in the instant case, resting as it did

upon a reasonable belief that the prisoner had violated his parole, cannot be doubted. ▆ By accepting the privilege of parole a prisoner consents to the broad supervisory and visitatorial powers which his parole officer must exercise over his person and property until the term of his sentence shall have expired or been terminated. To argue, therefore, as does defendant, that the search was unreasonable because it preceded his physical "arrest," that the "arrest" was without warrant and that the "arrest" occurred at a place other than at the place searched, is mere sophistry in the circumstances of his particular status. ▆ It is unnecessary for a parole officer to apply for a warrant to "arrest" a parolee who is already his prisoner and who is at all times *in custodia legis*. The administration of the parole system must be realistic, and not strangled in technical niceties. ▆ A parole officer's physical apprehension of his prisoner for suspected violation of parole is not an "arrest" in the sense that a peace officer arrests a private individual suspected of a crime but a mere transfer of the subject from constructive custody into actual or physical custody. ▆ Having constructive custody of his prisoner at all times, there is nothing unreasonable in a parole officer's search of the prisoner's premises where, as here, he has reasonable cause to believe the parole has been breached. The Supreme Court of the United States has characterized the violation of a condition of parole as being, in legal effect, on the same plane as an escape from the custody of the prison warden. "His status and rights were analogous to those of an escaped convict." (*Anderson* v. *Corall*, 263 U.S. 193 [44 S.Ct. 43, 68 L.Ed. 247].) It is our conclusion, therefore, that the search being a reasonable one because of the information possessed by the parole officers that defendant was associating with Leonard, who was both a felon and currently engaged as a narcotic peddler, and had thereby broken his faith with the prison authorities, there is no foundation for the contention that defendant's constitutional rights were violated. (*Martin* v. *United States*, 183 F.2d 436, 439-440.)

The claim is also made that the evidence is insufficient to show that defendant had knowledge of the presence of marijuana in his apartment. This is without merit. ▆ Undoubtedly it is essential to the crime of possession of narcotics that defendant have physical or constructive possession coupled with knowledge of the presence and narcotic character of the substance possessed. (*People* v. *Winston*, 46 Cal.2d

151, 161 [293 P.2d 40].) "To show such knowing possession the conduct of the parties, admissions or contradictory statements and explanations are frequently sufficient." (*People* v. *Foster*, 115 Cal.App.2d 866, 868 [253 P.2d 50]; *People* v. *Brickman*, 119 Cal.App.2d 253, 263 [259 P.2d 917].) Furthermore, evidence of other acts of similar nature are admissible when not too remote in order to show *guilty knowledge* of the possession of marijuana by defendant. (*People* v. *Torres*, 98 Cal.App.2d 189, 192 [219 P.2d 480].) In the instance case the evidence showed that defendant had been convicted of possession of narcotics in 1951 and was on parole from his sentence for that offense. Defendant himself admitted that he had used narcotics while on parole. There was also evidence that he had recently associated with a person who was trafficking in narcotics. The marijuana was found in an apartment under his exclusive control. When all these facts are considered together in the light most favorable to the prosecution, as we must on appeal (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Kristy*, 111 Cal.App.2d 695, 698 [245 P.2d 547]), it is clear that there was ample support for the factual determination by the jury that defendant had knowledge of the presence of marijuana found by the officers in his apartment and was therefore guilty of possession. (*People* v. *Bagley*, 133 Cal.App.2d 481, 484 [284 P.2d 36]; *People* v. *Torres, supra*; *People* v. *Brickman, supra.*) We cannot say that the jury was not entitled to conclude that Leonard's testimony that he broke into defendant's apartment and cached the marijuana there was merely a clumsy attempt to manufacture a defense to disprove defendant's guilty knowledge. (*People* v. *Foster*, 115 Cal.App.2d 866, 869 [253 P.2d 50].) As was said in *People* v. *Torres, supra*, p. 193: "Where the circumstances in evidence are such as would reasonably justify an inference of guilt, and the court so found, the fact that an inference of innocence might also just as reasonably have been predicated on such circumstances does not present a question of law reviewable by an appellate court. [Citations.]"

Defendant argues that the admission into evidence of the articles of parole, the photograph of himself found in Leonard's possession and the letter he wrote to Mr. Haydis constituted prejudicial error denying him a fair trial The record shows that Haydis testified he was defendant's parole officer and knew him in his official capacity. No objec-

tion was made to such testimony. ▮ Subsequently defendant objected to the introduction of the articles of parole, which provided, among the conditions of parole, that defendant was not to use or possess marijuana nor associate with former inmates of state prisons. The court admitted this evidence for the limited purpose of showing the officer's probable cause to suspect defendant of violating his parole. The photograph taken from Leonard was admitted for the same limited purpose. This was clearly correct. As has been stated, it was the officer's reasonable cause to believe defendant was violating his parole which justified their search of his apartment and their retaking of him into physical custody. As stated in *People* v. *Boyles*, 45 Cal.2d 652 [290 P.2d 535] : "Since the court and not the officer must make the determination whether the officer's belief is based upon reasonable cause, the officer must testify to the facts or information known to him upon which his belief is based." (P. 656.) These two documents bore directly on this question. ▮ Defendant's only objection to the admission of his letter to Haydis was that "it is incompetent, irrelevant and immaterial; outside the issues of this case." This was a general objection and no complaint of the ruling admitting such evidence may be maintained on appeal unless it was inadmissible for any purpose. (*People* v. *Stanley*, 78 Cal.App.2d 358, 360 [177 P.2d 968].) ▮ While only of slight probative value, the letter was admissible as containing expressions suggestive of defendant's guilt. ▮ For the first time on appeal, defendant also urges that his letter to the parole officer was a privileged communication under section 1881 of the Code of Civil Procedure.[6] A similar contention was rejected in *People* v. *Curry*, 97 Cal.App.2d 537, 548 [218 P.2d 153], the court stating: "Section 1881, subdivision 5, merely limits the disclosure to situations where the public interest would suffer by the disclosure. Actually, the public interest would suffer by the failure to disclose statements made to the probation officer which are inconsistent with defendant's later sworn testimony." (See also *Stroud* v. *United States*, 251 U.S. 13, 21 [40 S.Ct. 50, 64 L.Ed. 103].)

▮ Defendant contends that two lines of questions asked

---

[6]Section 1881 reads: "There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person can not be examined as a witness in the following cases: . . . 5. A public officer can not be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure."

of him by the prosecuting attorney constituted prejudicial misconduct. One colloquy is as follows: "Q. On or about the 5th of August, 1949, you were convicted of the felony of car theft and served a term of imprisonment for it, did you not? A. Yes. Q. And on or about the 10th day of July, 1951, you were convicted of the possession of marijuana and sent to prison on that charge? A. Yes. Q. And there was another count in the same information, possession of marijuana, that you were sent to prison on, two separate counts in other words. Is that right? A. I was sent up for two counts. Q. And those two counts were possession of marijuana? A. No. Q. Possession of narcotics? A. Yes. Q. What kind of narcotics? A. One was heroin and one was marijuana. Q. One was marijuana and one was heroin? A. Yes." No objections were interposed by defendant's counsel, and rightly so, since it would have been fruitless. As stated in *People* v. *Tabb*, 137 Cal.App.2d 167, 171 [289 P.2d 858]: "There is, of course, no question as to the propriety of impeaching a defendant by showing that he has been convicted of a felony. (Code Civ. Proc., § 2051.) Furthermore, questions are permitted to ascertain the nature of the offenses involved in the previous convictions [citations]."

 Defendant was also interrogated by his own counsel as follows: "Q. Since on or about April, 1954 [the date of defendant's admission to parole] have you used, purchased, dealt with or handled marijuana or any other narcotic? A. Yes. Q. When was that? A. Oh, up to about two months after I got out. Q. In that period of time did you use it? A. Yes. Q. Did you quit? A. Yes." Thereafter on cross-examination the prosecutor asked: "Q. By Mr. COCHRAN: What was the narcotic that you used after you were placed on parole? A. Marijuana. Q. You knew when you were placed on parole that it would be a violation of your parole then, didn't you? A. Yes. Q. But you still used it? A. Yes. Q. So that still didn't stop you, did it, the fact that you were forbidden on parole to use marijuana. That didn't prevent you from using it after you were placed on parole, did it? A. No." No objection was made to these questions. Defendant now asserts they were prejudicial. As clearly appears, the subject of defendant's use of marijuana while on parole was brought up by defendant's own counsel and was therefore within the legitimate scope of cross-examination. (Code Civ. Proc., § 2048.) Furthermore, if defendant be-

lieved the questions were improper, he should have objected at the time they were asked. He cannot object for the first time on appeal. (*People* v. *Murray,* 135 Cal.App.2d 600 [287 P.2d 775]; *People* v. *Beal,* 108 Cal.App.2d 200 [239 P.2d 84].)

Lastly, defendant contends that upon his motion for a new trial he assigned as errors of law the misconduct of the prosecution during its opening and closing remarks to the jury and the giving of certain instructions. He asserts he cannot direct attention to these errors because he "did not receive the records as required under Rules on Appeal, rules 33(a) and 33(b)." His contention is without foundation. ▪ The entire "normal record" as required by rule 33(a) is before us. If defendant desired any "additional record" under rule 33(b), it was incumbent upon him to request that it be included in the record by filing "with his notice of appeal an application describing the material which he desires to have included and the points upon which he intends to rely which make it proper to include it." We find no request that the prosecutor's opening and closing statements or the instructions given and refused be included in the record, nor does this material appear in the record. ▪ Under such circumstances the alleged errors complained of cannot be reviewed for, as stated in *People* v. *Lopez,* 93 Cal.App.2d 664, 668 [209 P.2d 439] : "It is well settled that an appellant must produce a record which discloses that an error relied upon has, in fact, occurred. (*People* v. *Ramirez,* 139 Cal.App. 380, 382 [33 P.2d 844]; rule 33(b) of Rules on Appeal.)"

The judgment and order appealed from are, and each is, affirmed.

Moore, P. J., and Ashburn, J., concurred.