Filed 3/15/22  P. v. Manos CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B306979 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA115678) |
| v. | |
| NICOLAS FIGUEROA MANOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven D. Blades, Judge.  Affirmed.

Ambrosio E. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Nicolas Manos appeals from a judgment following his conviction for first degree murder of his girlfriend. Manos contends (1) there is insufficient evidence of premeditation and deliberation to support the conviction; (2) the evidence is also insufficient to support a conviction for uncharged second degree murder; and (3) the trial court failed to give a required instruction on heat of passion. We affirm.

## PROCEDURAL BACKGROUND

Manos and the victim began dating in late 2016. During most of their relationship, Manos was either in a rehabilitation center or in a sober living facility to address his alcoholism. Manos, who was 31 years old at the time of the killing, had been an alcoholic since he was 17. Manos's relationship with the victim was volatile and marred by violence.

### 1. The February Incident

On February 20, 2017, the victim asked her childhood friend to pick her up from Manos's grandmother's house in Los Angeles. In a series of text messages, the victim told her friend that Manos had once again hit her, thrown her against a wall, punched the wall, and thrown her to the floor. He also tried to smash her phone and was watching her every move. The victim said she was scared and asked her friend to hurry.

When the friend arrived, the victim came out of the house. Manos followed closely behind her. He reached to stop her but she shrugged him off with a comment. The friend could not hear what they said. The friend got out of her car with the intent to help the victim. When Manos saw the friend, he returned to the house. The victim and her friend drove to the friend's house, where the victim cried about the incident.

## 2.    *The Week Before the Killing*

Some four months later, on June 16, 2017, Manos, the victim, and her friends traveled to Las Vegas to attend the Electric Daisy Carnival, a three-day rave.  One friend, John M., drove the group of seven in a passenger van with three rows of seats.  A.L. sat in the third row with Manos and the victim.  As they were driving in Las Vegas, Manos, who had been drinking from a bottle of whiskey, confided in A.L. about his relationship problems.  The victim, who was feigning sleep, became angry.  She and Manos fought.  Manos punched her in the chest.  The group demanded the driver stop the van, and Manos was forced out.  He cried and begged the victim for forgiveness.  The group left him in the parking lot of a McDonald's restaurant.  The driver briefly returned to McDonald's but only to give Manos his backpack and other personal items.

Manos later rejoined the group at a motel in Las Vegas.  At some point during the three-day rave, John M. and the victim kissed while they were on ecstasy.  She asked him not to talk about what happened.  The record is unclear whether Manos knew about the kiss.  He drank at least three bottles of wine each day while they were in Las Vegas, and he took ecstasy, mushrooms, and LSD.

When the group was set to return to Los Angeles, Manos took an entire bottle of prescription medicines, including Seroquel, Atarax (hydroxyzine), Wellbutrin, Lexapro, and Gabapentin because he had been fighting with the victim and he was "just being dramatic" and "desperate."  Manos was taken to the hospital by ambulance and his parents were called.

Manos's father came to pick him up from the hospital.  He drove Manos to Laughlin, Nevada, where his father had been

3

vacationing with friends and Manos's brothers. Manos appeared groggy and lethargic. He slept on the drive to Laughlin. Manos woke when his father turned off the car engine. He suddenly grabbed his father in a headlock and hit his father on the top of his head multiple times. His father extricated himself and managed to get Manos to the hotel room. His father emptied the two bottles of whiskey he found in Manos's luggage. Manos spent several days with his father and brothers in Laughlin. They eventually drove back to his father's house in Whittier. Manos planned to stay there, but, when his father discovered Manos was drinking, his father drove him to a sober living facility.

They arrived at the sober living residence on Friday, June 23, 2017, and the father left when he saw Manos walk into the facility. Unknown to his father, Manos was not able to register until Monday. Manos called the victim, who suggested they spend the weekend together. Shortly after midnight on Saturday, June 24, 2017, they rented a motel room near the victim's work and spent the night together. On Saturday morning, the victim went to work. Manos remained in the motel room, drinking heavily and taking psychotropic prescription drugs. The victim had planned to attend a party that night. She texted her friend John M. to ask if Manos could join them. John M. told her it was her call. The victim never arrived at the party.

### 3.    *The Week Following the Killing*

Beginning at 11:11 p.m. on that Saturday night, John M. received three text messages from the victim's phone, each 10 minutes apart: "Dude, why are you so fucking fat? It's kinda disgusting." "Cool, it's kinda disgusting." "Nick's right, you're

disgusting."[1] The next morning at 9:59 a.m., John M. received another message from the victim's phone stating, "You're the most disgusting human being I've ever seen." John M. thought the messages were strange and were out of character for the victim.

When the victim failed to arrive for her scheduled work shift on Sunday morning, her managers called and sent text messages to her phone. One of her managers received a reply from the victim's phone asking, "Who's this?" The reply message also stated she had found another job and asked to be left alone. Another manager received a text from the victim's phone stating that she had found other employment and that she was quitting.

On Monday, June 26, 2017, Manos used the victim's phone to search for pornographic videos and information about Pizza Hut. Manos later used the victim's debit card to order pizza from a local Pizza Hut for $78.74. Manos extended his stay at the motel twice during the week, paying with cash each time.

Over the next several days, the victim's family sent increasingly urgent text messages to her phone asking about her whereabouts. They received responses indicating she was in Big Bear with her boyfriend and that she was okay.

### 4. *The Investigation*

On Friday, June 30, 2017, almost one week after the victim was last seen, a housekeeper saw someone lying on the bed in the motel room. She told the front desk that the person was possibly unconscious. One of them called 911. When police entered the room, responding officers saw the victim's body on the floor. Manos was on the bed, wearing only a black shirt and snoring.

---

[1] Manos's first name is Nicholas. The record shows the victim referred to him as "Nick."

Manos was "not all there" and officers thought he was intoxicated although he did not smell of alcohol. They observed "a lot" of alcohol bottles and several pizza boxes inside the room. The officers helped Manos dress and sit on a chair outside of the room. After the paramedics arrived, Manos appeared to go in and out of consciousness as he interacted with them, but he sat upright and did not fall off his chair.

Manos told the paramedic who treated him at the scene that he got into an argument with his girlfriend, he hit her with his fist, and then began drinking alcohol and taking "psych medications." Manos was taken to the hospital.

The next day, detectives interviewed Manos. At times, Manos believed the victim was still alive and told the detectives he spoke with her the day before. Although he appeared confused about when certain events occurred, he admitted he hit the victim after they fought about going out. She stated she was leaving and he thought, "What the fuck? It's Saturday night, man. There's a – a hotel room. Like, stay. I wanna, you know, fuck and have a good time and chill out." They then began to argue, saying things like: "I hate you. You're a loser." "I hate you. You're fat."

He described the fight as "those little things that go below the belt. It usually starts over some trivial little bullshit. She always says I jump to conclusions, and then she gets mad at me and I get mad at her back. . . . But it ended up with her, like, jumping at me, and I grabbed her. And she was like, 'I fucking hate you.' And then I just [knocks on table] – I hit her a couple of times." He stated he hit her twice while she was on the floor and he was on top of her.

He explained he was paranoid about her because she lied to him "a lot" and cheated on him. He admitted he did not call 911 after he struck the victim because he did not want to go to jail. He also recalled ordering pizzas from Pizza Hut and obtaining alcohol from the liquor store across the street from the motel during the week.

5. *The Trial*

Manos was charged with one count of first degree murder. (Pen. Code, § 187, subd. (a).) At trial, the People presented evidence of the events surrounding the killing as described above.

The Los Angeles County Sheriff's detective who investigated the crime scene testified he observed blood spatter on the walls of the kitchenette area, in the bathtub and on the shower back wall, the shower curtains, a pillow between the bathroom and the sleeping area, the bed, and the wall behind the headboard. There was also a pool of blood near the wall dividing the bathroom and bedroom areas. More blood was found on the sink counter and doorjamb. All of the blood found inside the room matched the victim's DNA.

The detective found 11 empty bottles of E&J Brandy, two bottles of Jim Beam Whiskey, several bottles of prescription drugs, and pills scattered throughout the room. The detective also found several ATM receipts and the victim's Visa bank card showing cash withdrawals of approximately $400. Based on the text messages and surveillance video footage from the motel, the detective opined the victim was killed sometime between 10:00 p.m. Saturday, June 24, 2017, and Sunday morning.

A sheriff's department criminalist testified the victim was struck at least twice and was low to the ground or on the ground

with Manos standing over her when she was hit. It also appeared Manos used towels to clean up some parts of the room.

A medical examiner determined the cause of death was blunt force trauma to the head and certain other factors, including possible strangulation and aspiration of blood. He explained the decomposition of the body prevented greater certainty regarding what factors aside from blunt force trauma to the head may have contributed to her death.

The medical examiner found multiple bruises on the victim, including on the right eyebrow area, lower forehead near the nose bridge, left eye, left temporal region between the left eye and left ear, left jaw, left and right upper chest, back of left elbow, left knee, and front legs. There was bleeding under the scalp on both sides of her forehead and above both ears.

The victim's nose was broken and there was blood in the respiratory tract all the way into the lungs, which led the medical examiner to believe it was possible that she died by aspirating her own blood. He estimated it could take up to 30 or 40 minutes for someone who was knocked unconscious to die by aspirating her own blood.

Manos testified in his own defense. He explained he drank heavily after the victim left for work on Saturday morning. He recalled she returned to the motel room after work in the early evening and left again to change out of her work uniform. Manos testified he continued to drink after she left and blacked out. He woke up the next morning and discovered her body on the floor. He briefly attempted chest compressions but knew she was dead. He lay down next to her and cried, wishing he could join her.

Surveillance video shows the victim leaving the motel on Saturday morning, returning at approximately 4:00 p.m. wearing

8

her work uniform, and returning to the motel for the last time at 10:02 p.m. on Saturday, June 24, 2017.

Manos presented expert testimony regarding the effects of excessive alcohol consumption, including the inability to lay down memory, known as blackout, and the brain's tendency to fill in the details of an event one cannot remember. The person may also become more belligerent and angry. These effects could last for several days. The expert explained the use of psychotropic drugs in combination with excessive alcohol would dramatically increase these symptoms.

The jury found Manos guilty of first degree murder. He was sentenced to 25 years to life in prison. Manos appealed.

## DISCUSSION

Manos contends there is insufficient evidence of premeditation and deliberation to sustain a first degree murder conviction. He also argues there was insufficient evidence even to reduce the conviction to second degree murder. Finally, he contends the trial court erred in not giving an instruction on heat of passion. We disagree on all counts.

## 1. *Standard of Review*

Upon a challenge to the sufficiency of evidence for a jury finding, we " 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Clark* (2011) 52 Cal.4th 856, 942.) "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced

from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury 's verdict. [Citation.]" (*Ibid.*)

The same rules apply for determining substantial evidence of a willful, deliberate, and premeditated murder. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*).)

## 2. *Legal Principles Applicable to First Degree Murder*

### A. *The* Anderson *Factors*

A "willful, deliberate, and premeditated killing" is murder in the first degree. (Pen. Code, § 189.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).)

" 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citation.]" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*).) "[P]remeditation and deliberation is not synonymous with malice

10

aforethought . . . it requires 'substantially more reflection.' [Citation.] Clearly, there must be some evidence that the defendant actually engaged in such reflection, and not merely had the time to do so." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1270 (*Boatman*).)

The Supreme Court in *People v. Anderson* identified three categories of evidence as "pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing." (*Perez, supra,* 2 Cal.4th at p. 1125, citing to *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.) *Anderson* observed that first degree murder convictions may be upheld when there is "extremely strong" evidence of planning or there is evidence of motive in conjunction with planning or manner of killing. (*Anderson,* at p. 27.)

The *Anderson* categories are ones that courts " 'typically' find sufficient" to uphold first degree murder convictions. (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) But those factors are not exclusive and are more of an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*Perez, supra,* 2 Cal.4th at p. 1125.) " 'Since *Anderson,* [the Supreme Court has] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight.' [Citation.]" (*People v. Rivera* (2019) 7 Cal.5th 306, 324.) The high court in *People v. Davis* (1995) 10 Cal.4th 463, 510 (*Davis*), for example, concluded the evidence of the manner of killing – strangulation – was sufficient by itself to support a finding of

11

premeditation and deliberation.  (See also *People v. Shamblin* (2015) 236 Cal.App.4th 1, 13.)

   *B.    Failure to Aid*

   Some cases prior to *Anderson* found a defendant's failure to aid the victim or ask for help after inflicting life-threatening injuries to be one factor in determining premeditation and deliberation.  In *People v. Cook* (1940) 15 Cal.2d 507, 516, the court held a jury may determine whether premeditation exists "from a consideration of the type of weapon employed and the manner of its use; the nature of the wounds suffered by the [victim]; the fact that the attack was unprovoked and that the [victim] was unarmed at the time of the assault; the conduct of [the] assailant in . . . neglecting to aid [the victim] . . . , and [the assailant's] immediate flight thereafter from the scene of the assault."

   In *People v. Kristy* (1952) 111 Cal.App.2d 695, 708, the defendant claimed the gun in his possession accidently misfired, killing the victim.  The *Kristy* court concluded a willful, deliberate and premeditated intent to kill could be inferred from "the conduct of appellant both prior to and immediately after the victim met her death, his neglect to aid her after he says she was accidentally shot, [and] his subsequent flight from city to city. . . ."  (*Id.* at p. 716; see also *People v. Clark* (1967) 252 Cal.App.2d 524, 529.)

   In post-*Anderson* cases, courts have considered the failure to aid as relevant to *Anderson*'s manner of killing category.  In *Koontz, supra*, 27 Cal.4th at pages 1081–1082, the court applied the *Anderson* factors and "easily" found evidence of motive, planning, and "a manner of killing indicative of a deliberate intent to kill (firing a shot at a vital area of the body at close

12

range, then preventing the witness from calling an ambulance)." (See also *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201–202 [first degree murder conviction affirmed, in part, because the defendant dissuaded the victim's mother from seeking medical help by lying to her about the nature and extent of her injuries and then actively prevented the mother from calling 911 until after the victim had died].)

C.     *Length of Time to Complete the Killing*

Although premeditation and deliberation can occur in a short amount of time, courts have concluded that the length of time to complete a killing may demonstrate a defendant engaged in the reflection necessary for premeditation and deliberation. For example, in *People v. Hovarter* (2008) 44 Cal.4th 983, 1019–1020, the court determined evidence that the victim "was strangled with a rope and that her death from asphyxiation would have taken between five and eight minutes" permitted a rational factfinder to infer that the manner of killing demonstrated deliberation, as such a "prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act. . . ."  (See also *Davis, supra,* 10 Cal.4th at p. 510 [sufficient evidence of premeditation and deliberation for first degree murder where, among other facts, defendant strangled the victim for approximately five minutes].)

D.     *Post-killing Conduct*

Courts have also held "the jury could reasonably consider defendant's conduct after the killing in relation to the manner of killing." (*People v. Disa* (2016) 1 Cal.App.5th 654, 667 (*Disa*); *Perez, supra,* 2 Cal.4th at p. 1128.)  These cases affirm that post-

killing conduct may actually reflect a lack of sudden anger or rage and thus support a premeditation finding. In *Disa,* the defendant smoked two cigarettes, slept for a few hours, ate, and went to work after the killing. The court determined a jury could find this conduct inconsistent with a state of mind that would have produced a rash, impulsive killing. (*Disa,* at p. 667.)

In *People v. Cage* (2015) 62 Cal.4th 256, 277 (*Cage*), our Supreme Court concluded, "a jury could have inferred from the evidence of defendant's actions in and outside the house after the shootings that he was not possessed by a sudden rage, but was acting in the course of premeditated killings. Specifically, there was evidence from [a witness] that defendant answered one of his phone calls to the house at a time when the evidence suggested that the killings had just occurred. And there was evidence from [the victim's neighbor], that when he went outside to investigate the source of loud banging noises, he saw a man (defendant) wearing a long coat standing outside [the victim's] house. Defendant then walked toward [the neighbor's] house, noticed [the neighbor], waved, mumbled something, and continued walking. Defendant began to run only when an alarm sounded. These actions hardly seem to reflect a person who had been overcome by sudden anger and acted as the result of rash impulse." (*Ibid.*)

*Boatman* stands in contrast. The court considered the defendant's reaction after shooting his girlfriend in the face in its decision to reduce a first degree murder conviction to second degree. "[T]here is nothing in any of his statements to indicate that he considered shooting [her] beforehand or carefully weighed considerations for and against killing her." (*Boatman, supra,* 221 Cal.App.4th at p. 1265.) The defendant was "horrified and

14

distraught" after the shooting. (*Id*. at p. 1267.) He immediately told his brother to call the police; he could be heard in the background of the 911 call crying and repeating, " '[n]oooo,' '[b]aby,' and '[b]aby are you alive, baby' "; he told responding police to call an ambulance; and he cried during the trip to the police station, inquired about his girlfriend, and expressed that he could not lose her and would do anything for her. (*Id*. at pp. 1258–1261.)

### 3. *Substantial Evidence Supports a Finding of Premeditation and Deliberation*

With these authorities in mind, we conclude there is substantial evidence from which the jury could reasonably infer Manos acted with premeditation and deliberation. We find two *Anderson* factors are present: manner of killing and motive. These alone are sufficient to affirm Manos's conviction. (*Anderson, supra,* 70 Cal.2d at p. 27 [observing the Supreme Court sustains verdicts of first degree murder when there is evidence of motive in conjunction with either planning activity or manner of killing].)

### A. *Manner of Killing*

We begin with evidence of the manner of killing, which includes the defendant's failure to seek aid for the victim and the length of time for the victim to die.

The evidence showed Manos failed to help the victim after he inflicted severe and repeated injuries. The coroner estimated it could have taken up to 30 or 40 minutes for the victim to die from aspirating her own blood – time available for Manos to assist the victim or call for help. The length of time would have allowed for meaningful reflection and a deliberate choice to end

15

the victim's life. Manos made a conscious decision not to call 911 because he did not want to go to jail.

Manos told the detectives that after he hit the victim, "[s]he just laid there, like, crying and . . . laughing a little bit. [¶] And then she just – and that was that." He admitted to police he was aware she was dying. He said, "That was probably a stupid decision on my part [to wait and not call for help], 'cause she, like, was dying of alcohol poisoning at that moment and I just let it happen." The jury could infer from his statements that he knew she was dying, knew he could help her by dialing 911, but, with premeditation, chose to watch her die. Not only does this evidence support premeditation based on the beating itself, the evidence also supports a premeditation finding for the period after the beating had concluded and during the approximately 40 minutes it took the victim to die. Manos knew the victim was dying and he "just let it happen."

As in *Cage* and *Disa,* the jury could have found that Manos's conduct after the victim had died was inconsistent with a state of mind that would have produced a rash and impulsive killing. In contrast is *Boatman, supra,* 221 Cal.App.4th at pages 1258–1261, where the defendant cried out in horror at what he had done.[2]

Manos used the victim's phone on the night of the killing and at 9:59 a.m. the next morning to send taunting text messages to the victim's friend, John M. These texts demonstrated Manos's

---

[2] Manos's testimony that he lay down next to the victim and cried, wishing he could join her evinces some similarity with the facts of *Boatman.* The jury was free to disbelieve that evidence or give it little weight in finding that Manos's killing was premeditated.

16

concern was not for the victim but to ridicule a potential romantic rival. Although Manos may not have been aware of the victim's kiss with John M. in Las Vegas, Manos told the police he knew the victim had cheated on him.

Manos also had the presence of mind to reassure the victim's family she was alive and safe. He used towels in the room to clean some of the blood and spent the next several days feeding and entertaining himself using the victim's money. "[T]hese actions hardly seem to reflect a person who had been overcome by sudden anger and acted as the result of rash impulse." (*Cage, supra,* 62 Cal.4th at p. 277.) The jury here reasonably could have so found. The jury could have inferred from these facts "the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*Perez, supra,* 2 Cal.4th at p. 1125.)

The manner of killing itself supported the jury's finding of premeditation and deliberation: the victim's wounds were concentrated in the vital areas of her head and chest, and her blood was found throughout the motel room. Manos disclosed to the detectives that he got on top of the victim and punched her. Although he stated he only punched her twice and was "not gonna just beat the shit out of the woman I love[,]" the coroner discovered multiple bruises on both sides of her face and the upper portion of her chest as well a broken nose and bleeding under her forehead and above both ears. Police also observed a pool of blood near the wall dividing the bathroom and bedroom areas and blood splatter throughout the motel room, including in the kitchenette area, the bathroom, the sleeping area, and behind the headboard. The jury could have reasonably found that far

from a couple of punches, the terrific beating extended beyond what Manos confessed to police, both in time and in space.

  *B.*  *Motive*

  As to motive, the record discloses evidence from which the jury could reasonably infer that, in the months preceding the killing, Manos had become angry and obsessed with the victim, resented her friends, and that in the moments before the killing, he was angry with the victim for refusing to have sex with him, and wanting to leave him alone in a motel room so she could go to a party with friends.

  Manos's anger with the victim developed over several months prior to the killing. In February 2017, the victim told her childhood friend that, among other violent actions, Manos had tried to smash her phone and was watching her every move. The friend drove to Manos's grandmother's house to pick up the victim. Her presence dissuaded Manos from preventing the victim from leaving.

  In Las Vegas, the victim's friends forced Manos out of the van after he punched her in the chest. The victim and her friends abandoned him in a parking lot. In the interview with police on July 1, Manos told the detectives that the victim's friends told her not to be with him due to his violent outbursts. She also lied to and cheated on him. As a result, he was paranoid, "thinking about, like, what did you do wrong?"

  Manos draws different inferences from the same facts. When the victim told him on Saturday night that she was leaving, he stated he "snapped" because he wanted her to stay with him in the motel room and have a good time. He argues other facts are more consistent with spontaneity than with premeditation because he did nothing to make sure she died after

he struck her. According to Manos, if he actually intended to kill the victim, he would have continued punching her until she died. That the coroner testified she did not die immediately is proof that he did not intend to kill her. He also argues there is no evidence he was aware the victim was dying.[3] As a result, his failure to render aid was not indicative of an intent to kill.

Even if we were to assume there were alternative interpretations of the evidence, that does not assist Manos. Although a jury, when faced with conflicting reasonable inferences, must adopt the one that favors the defense (CALCRIM No. 224; *People v. Merkouris* (1956) 46 Cal.2d 540, 562), that is not the test on appeal. We have described the substantial evidence from which the jury could reasonably infer Manos acted with premeditation and deliberation, including his motive, the widespread injuries the victim suffered, his decision not to call 911 even though he knew the victim was dying, and his conduct soon after her death. "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) We may not reverse the judgment solely because the evidence might also support a contrary finding. (*People v. Salazar* (2016) 63 Cal.4th 214, 245.)[4]

---

[3] The record does not fully support this argument, but includes a statement by Manos to the police that he knew the victim was dying and he "just let it happen."

[4] Because we conclude substantial evidence supports Manos's conviction for first degree murder, we need not address his argument that there was insufficient evidence for a second degree murder conviction.

### 4. *The Trial Court Did Not Err in Refusing to Instruct Sua Sponte on Heat of Passion*

Manos contends the trial court was required to instruct the jury on a heat of passion theory of voluntary manslaughter. A trial court must instruct on lesser included offenses, even in the absence of a request, "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) Manslaughter is a lesser included offense of murder. (*People v. Lewis* (2001) 25 Cal.4th 610, 645.)

The trial court held several conferences with counsel on whether a heat-of-passion instruction should be given. Prior to trial, defense counsel said he did not want the instruction, although he later asked that it be given. The court ultimately determined there was insufficient evidence for the instruction.

According to Manos, the instruction was warranted because the evidence showed he killed in the heat of passion. He was provoked by the victim's statement that she hated him, their intense relationship, his knowledge of her infidelity, and her desire to leave him in the motel to be with her friends, which included John M.

Even if we were to accept Manos's view of the evidence and his argument that a provocation instruction should have been given, we agree with the Attorney General that the error was harmless under any standard of review. (*People v. Moye* (2009) 47 Cal.4th 537, 558 n. 5; *Breverman, supra,* 19 Cal.4th at pp. 177–178; *People v. Watson* (1956) 46 Cal.2d 818, 836 [more favorable outcome reasonably probable]; *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt].)

20

"Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions." (*People v. Lewis, supra,* 25 Cal.4th at p. 646.) Here, the jury found Manos acted with deliberation and premeditation. That means the jury necessarily decided Manos did not act in the heat of passion. He premeditated. "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and demonstrates that defendant was not prejudiced by the failure to give his requested instruction." (*People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*), rehg. den. opn. mod. July 9, 1991.)

*Wharton's* holding – that a finding of premeditation makes harmless any error in failing to instruct on heat of passion – is binding on us, and we apply it here. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We observe that at least one appellate court has concluded that the finding of premeditation does not automatically render harmless the failure to instruct on heat of passion. (See *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488 (*Ramirez*).) *Ramirez* relied on a pre-*Wharton* Supreme Court case, *People v. Berry* (1976) 18 Cal.3d 509 *(Berry)*. *Wharton* does not mention *Berry* on this point, and *Ramirez* does not mention *Wharton*.

Several courts of appeal have declined to follow *Ramirez*, finding it inconsistent with *Wharton.* (See, e.g., *People v. Franklin* (2018) 21 Cal.App.5th 881, 894–895; *People v. Peau*

21

(2015) 236 Cal.App.4th 823, 831 *(Peau).)* *Peau* reconciles what it calls the "tension" between *Wharton* and *Berry* by pointing out that *Berry* does not discuss whether the jury's finding of premeditation does or does not render harmless a failure to instruct on heat of passion. Its focus was on whether other instructions adequately covered heat of passion. (*Id.* at pp. 831-832.) We agree with *Peau* and *Franklin,* and apply *Wharton.*

### *DISPOSITION*

The judgment is affirmed.


                                                    RUBIN, P. J.

I CONCUR:



        MOOR, J.

22

The People v. Nicolas Manos

B306979


BAKER, J., Dissenting


There is substantial evidence defendant Nicolas Manos (defendant) committed murder, but not premeditated and deliberate first degree murder. The majority's opinion, which disagrees and affirms defendant's first degree murder conviction, opens a new front in settled law concerning the evidence courts generally require when holding sufficient evidence of premeditation was presented at trial. I believe this unusual approach is unwise.

The leading case discussing the sufficiency of premeditation and deliberation evidence is *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*). In that case, our Supreme Court explained: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing

was the result of a 'pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at 26-27.) Our high court has also explained the *Anderson* factors should not be read to establish strict rules (see, e.g., *People v. Sanchez* (1995) 12 Cal.4th 1, 32), but courts routinely and appropriately focus on the *Anderson* factors when deciding whether sufficient evidence of premeditation and deliberation was presented.

Here, there is insubstantial evidence of the type described in *Anderson*. There was zero evidence of planning activity; the majority does not contend otherwise. There was no evidence about the killing from which a jury could have determined defendant's manner of killing was "so particular and exacting" (*Anderson, supra*, 70 Cal.2d at 27) that he must have acted from a preconceived design to kill; no weapon was used and the injuries and bruising over the victim's body were, as the majority says, "widespread." (If, as the majority suggests, nothing more than blows to the head and chest are needed to constitute evidence of a manner of killing suggestive of preconceived design, there are few attacks on a victim resulting in death that would not so suggest.) There was some evidence of motive, but it was not strong. Courts focus on a motive to kill, not just general antipathy, and the motive evidence here indicates defendant did not want the victim to leave him for the evening; the idea that

2

defendant made a calculated decision to kill the victim seems in tension with such a motive (unless we posit defendant thought the victim was leaving him permanently—there doesn't seem to be any evidence of that—or flew into a jealous rage and "snapped"—which seems to undercut at least to some degree the idea of premeditation).

What really motivates the majority's holding, then, is the contention that a preconceived plan to kill can be divined from defendant's post-attack conduct: his assumed knowledge that the victim was dying and his inferred refusal to render aid. If that is enough to uphold a premeditated and deliberate murder finding, the circumstances under which killers can be found guilty of first degree murder have been greatly expanded: most killers, even those who act rashly or recklessly, are aware the injuries they inflict may be likely to cause death and opt not to attempt to aid their victims and risk apprehension. I do not believe the most serious degree of murder should apply so broadly.

In my view, defendant deserves an indeterminate life sentence for what he did: there was sufficient evidence of implied malice (see generally *People v. Knoller* (2007) 41 Cal.4th 139, 152) and there was no reversible error in refusing to instruct on heat of passion voluntary manslaughter (see generally *People v. Breverman* (1998) 19 Cal.4th 142, 162, 177). But the evidence does not justify a first degree murder conviction.

BAKER, J.

3